United States Court of Appeals,

Eleventh Circuit.

No. 95-5322.

UNITED STATES of America, Internal Improvement Trust Fund, Board of Trustees, of the State of Florida; State of Florida, Plaintiffs-Appellees,

Key West Harbor Services, Inc., Intervenor-Plaintiff, Appellee,

v.

M/V JACQUELYN L. (O.N. 965116) Her engines, Apparel, Tackle, Appurtenances, etc., in rem; Joseph Mogavero, in personam; Bethany Clark, in personam, Defendants, Intervenor-Defendants-Appellants.

Dec. 5, 1996.

Appeal from the United States District Court for the Southern District of Florida (No. 91-10067-CIV-NESBITT), Lenore C. Nesbitt, Judge.

Before KRAVITCH and BARKETT, Circuit Judges, and HARRIS[*], Senior District Judge.

PER CURIAM:

We affirm for the reasons expressed in the district court's opinion, 900 F.Supp. 462, which is attached hereto as Appendix A.

APPENDIX A

United States District Court Southern District of Florida

Case No. 91-10067-CIV-NESBITT

Sept. 21, 1995.

UNITED STATES OF AMERICA, et al., Plaintiffs,

v.

M/V JACQUELYN L, et al., Defendants.

*ORDER GRANTING SUMMARY
JUDGMENT AS TO COUNT I*

[*]Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting by designation.

NESBITT, District Judge.

This cause comes before the Court upon Plaintiff United States of America's ("United States") Motion for Partial Summary Judgment, filed February 15, 1995 (DE # 98), and Defendants cross-motion to strike and for partial summary judgment, filed March 16, 1995 (DE # 102).

BACKGROUND

On July 7, 1991, Defendant M/V Jacquelyn L, operated by Defendants Joseph Mogavero and Bethany Clark, ran aground on Western Sambo Reef, an area Plaintiffs contend is, and was at the time of the grounding, part of the Florida Keys National Marine Sanctuary (the "Sanctuary"). Accordingly, Plaintiffs United States, The Board of Trustees of the Internal Improvement Trust Fund of the State of Florida, and The State of Florida Department of Natural Resources filed their three-count Complaint alleging violations of state and federal law and a claim of negligence under general maritime law. Only Count I is at issue in the instant motion. In that count, the United States alone alleges that Defendants violated the strict liability provisions of the Marine Protection Research and Sanctuaries Act ("MPRSA"), 16 U.S.C. §§ 1431-1445.

On November 16, 1990, Congress enacted the Florida Keys National Marine Sanctuary Act (the "Sanctuary Act"), Pub.L. No. 101-605, 104 Stat. 3089 (1990), which designated 2800 nautical miles of coastal waters in the Florida Keys as the Florida Keys National Marine Sanctuary (the "Sanctuary"). The Sanctuary Act provides that "[t]he Sanctuary shall be managed and regulations

enforced under all applicable provisions of [the MPRSA] as if the Sanctuary had been designated" thereunder. Sanctuary Act, § 5(a). Accordingly, in the instant case the United States seeks damages from Defendants for a violation of § 1443 of the MPRSA, which imposes strict liability for damage or injury to any sanctuary resource. The Sanctuary Act further provides that the designation of the Sanctuary "shall not take effect for any area located within the waters of the State of Florida if, not later than 45 days after the date of enactment of this Act, the Governor of the State of Florida objects in writing to the Secretary of Commerce." Sanctuary Act, § 5(c). Western Sambo Reef is located within the waters of the State of Florida.

On September 4, 1992, Defendants filed a motion for summary judgment as to Count I, contending that former Governor of Florida Bob Martinez objected to the designation of the Sanctuary with respect to areas within Florida waters. Defendants relied on a letter from Governor Martinez to then Secretary of Commerce Robert Mosbacher dated December 31, 1991 (the "Martinez Letter"). In the letter, Governor Martinez stated that he and the Florida Cabinet had "passed a resolution on December 18, 1990 to include state lands and resources within the boundary of the Florida Keys National Marine Sanctuary, with certain provisions." The referenced resolution lists the various "provisions", including the completion and approval by the State of Florida of a Comprehensive Management Plan ("CMP") for the Sanctuary. Thus, Defendants argued that Governor Martinez objected to the designation of the Sanctuary as to Florida waters until such time as a comprehensive management

plan was approved.

Finding an issue of fact as to whether Governor Martinez had objected to the designation, the Court denied Defendant's motion for summary judgment. On July 11, 1994, Plaintiffs moved the Court to reconsider its ruling, in light of *U.S. v. Fisher,* 22 F.3d 262 (11th Cir.1994), that an issue of material fact existed as to whether the Sanctuary Act was in effect with respect to areas of the Sanctuary within Florida's seaward boundary. The Court denied the motion for reconsideration as *Fisher* did not resolve the issue of whether Governor Martinez had objected to the designation. The Court directed the parties to proceed with further discovery and to renew motions for summary judgment if appropriate after discovery was completed.

In its motion for partial summary judgment, the United States seeks summary judgment on Count I against only the vessel, Defendant M/V Jacquelyn L, establishing that it is strictly liable *in rem* for damages to be established at trial. Defendants respond with a motion to strike[1] and a cross motion for summary judgment on the grounds that the State of Florida objected to the designation

---

[1] Defendants request the Court to strike the United States' motion for partial summary judgment for failure to serve exhibits as required by the Federal Rules of Civil Procedure. Although it appears that the United States sent their motion for partial summary judgment to the wrong address, Defendants did receive the State of Florida's memorandum of law in support of the motion and had notice of the motion by, at the latest, March 1, 1995, the date Defendants inquired of the United States as to whether it had in fact filed a motion for partial summary judgment. The Court granted Defendants an extension of time to March 16, 1995 to respond to the motion for partial summary judgment. Defendants requested no further extensions of time and responded to the motion for partial summary judgment on March 16, 1995. Accordingly, the motion to strike must be denied.

of the Sanctuary with respect to areas of the Sanctuary within Florida waters.[2]

## DISCUSSION

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The movant bears the initial burden of informing the Court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). In response to a properly supported motion for summary judgment, "the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts which show a genuine issue for trial." FED.R.CIV.P. 56(e). If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the Court must enter summary judgment for the moving party. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. The Court is not to resolve factual issues, but may only determine whether factual issues exist. The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty*

---

[2]Defendants style their response as a "Memorandum in Opposition" rather than a cross-motion for summary judgment. However, in the memorandum, Defendants request the Court to "award summary judgment unto the Defendants with respect to the undisputable facts set forth in this opposition paper that the State of Florida objected to the establishment of the [Sanctuary] within the seaward boundaries of the state of Florida as of July 7, 1991."

*Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In support of its motion for summary judgment the United States contends that no genuine issue of material fact remains as to whether the State of Florida objected to the designation of areas within Florida waters as part of the Sanctuary. Focusing on those portions of the Martinez Letter and the Resolution of the Governor, Cabinet, and Department of Natural Resources of Florida (the "Resolution") which state that Florida resolved to "include state lands and resources within the boundary of" the Sanctuary, the United States argues that the State of Florida expressly included state lands in the Sanctuary and intended for the Sanctuary Act to take immediate effect. Thus, contends the United States, Defendants are strictly liable for damages resulting from the grounding and only the amount of damages remains to be determined.

In opposition to the motion, Defendants emphasize the remainder of the quoted sentence of the Martinez Letter and Resolution which states that lands within the Florida boundary are included within the Sanctuary "with certain provisions." Defendants contend that the provisions listed in the Resolution are conditions precedent to the inclusion of Florida lands within the Sanctuary. Among these conditions is the completion of a Comprehensive Management Plan (CMP), which has not yet occurred. Until these conditions have occurred, Defendants argue, the designation of the Sanctuary does not take effect with respect to areas within Florida waters, and the enforcement provisions do not apply to those areas. In essence, Defendants argue that Governor

Martinez did object to the designation of the Sanctuary with respect to areas within Florida waters until such time as the alleged conditions precedent are satisfied.

In response, the United States contends that the "certain provisions" language in the Martinez Letter and Resolution simply indicates that Florida recognized that it would have the opportunity, once the CMP was completed, to reconsider whether areas within state waters would remain within the Sanctuary. This second opportunity to object, according to the United States, is contemplated in the MPRSA, § 304 and does not alter the fact that the Sanctuary designation, and the enforcement provisions of the MPRSA, became effective with respect to all areas contemplated by the Sanctuary Act on the effective date of the Act. The United States maintains that, rather than an objection, the Martinez Letter and the Resolution constituted an express acceptance of the designation and a representation of the State of Florida's preliminary understanding of the respective rights and obligations of the State and Federal Government regarding the management of Florida lands included within the Sanctuary.

Section 5(c) of the Sanctuary Act places the burden of objecting to the designation on the Governor of Florida. To prevent the designation from taking effect, the Governor must object in writing to the Secretary of Commerce within forty-five days of the date of enactment. Absent a clear, written objection from the Governor, the Act automatically takes effect for all areas delineated in the Act, including those areas within Florida waters.

"It is well established that, absent a clear direction to the

contrary, a law takes effect on the date of its enactment." *Gozlon-Peretz v. United States,* 498 U.S. 395, 404, 111 S.Ct. 840, 846, 112 L.Ed.2d 919 (1991). *See also, U.S. v. Fisher,* 22 F.3d 262, 267 (11th Cir.1994) (citing *Gozlon-Peretz* and concluding that the Sanctuary Act took effect on the date of enactment as to areas outside the Florida boundary despite the fact that a comprehensive management plan had not been completed). The burden of demonstrating that the Sanctuary Act is not in effect with respect to areas within the Florida waters is therefore on the party who challenges that it is in effect. Since the Sanctuary Act automatically takes effect with respect to areas within Florida waters absent an objection by the Governor, the burden is on Defendants to demonstrate that the Martinez Letter constitutes an objection as contemplated by section 5(c) of the Act.

A careful reading of the Martinez Letter indicates that it is not an objection to the designation. Governor Martinez states in the second paragraph that representatives met with officials of the National Oceanic and Atmospheric Administration (NOAA) to discuss the effect the designation would have on state authority. At this meeting, according to the Governor, state officials were assured that the State would have an additional forty-five days following development of the final management plan to object to any terms of the designation, including the boundary. The Governor then states, in the third paragraph,

> *[r]ecognizing the inclusion of state lands is critical to full implementation of the sanctuary's purpose and should be highly beneficial to the marine resources of the Keys, both state and federal,* the Florida Cabinet and I, acting as the Board of Trustees of the Internal Improvement Trust Fund, and the Executive Board of the Florida Department of Natural

Resources, passed a resolution on December 18, 1990 *to include state lands and resources within the boundary of the Florida Keys National Marine Sanctuary,* with certain provisions.

Martinez Letter at 1-2 (emphasis added). While this language may not indicate unequivocal acceptance of the designation, such is not required for the designation to take effect. All that is required is that Governor Martinez not have objected.

The Governor prefaced the "certain provisions" language with a statement indicating that he believed the inclusion of state lands was "critical" to achieving the Act's purpose. This indicates, at the least, that his intent was ultimately to include state lands within the Sanctuary. When read in conjunction with his belief that the State would have a second opportunity to object to the designation, it seems clear that the Governor did not intend to object to the designation, he intended immediately to include state lands within the Sanctuary. Taken in context, the "certain provisions" mentioned in the letter and in the Resolution were conditions, not to the acceptance of the designation[3], but to the State's tacit agreement not to object when the second opportunity arose—after completion of the CMP.

The documentary evidence supplied by both sides is consistent with this view, beginning with the Resolution itself. Provisions one and four state that, prior to completion of the CMP, the State of Florida and the Department of Commerce shall enter into an

---

[3]Indeed, it does not appear that the Governor could have conditioned his "acceptance" of the designation. As indicated above, while § 5(c) of the Sanctuary Act allows the Governor to object to the designation, nothing in the Act requires his acceptance for the designation to take effect. It is difficult to see how the Act could allow for a "conditional acceptance" without first providing for a "simple acceptance."

interim agreement which will "[e]nsure the state's participation in decisions which modify the provision of the "Area to be Avoided' " and "[d]elineate the roles of Florida and the Department of Commerce concerning implementation and enforcement of [the Sanctuary and MPRSA]." Resolution at 2. By providing for an interim agreement which ensures Florida's participation in changes to the "Area to be Avoided" and in enforcement of the Sanctuary Act and MPRSA, the Resolution clearly contemplates the immediate inclusion of state lands within the Sanctuary. If state lands were not included in the Sanctuary because the Governor objected, Florida would have no interest in implementation or enforcement and the interim agreement would be without purpose. If, however, the provisions are read as a whole and in the context of Florida's understanding that it "may certify that any of the terms of the [CMP] is unacceptable," Resolution at 2, it becomes clear that the provisions were meant as statements of understanding, rather than as conditions precedent to the effectiveness of the designation.

Various individuals who were employed with the state government both before and after the grounding of the M/V Jacquelyn L also view the provisions as statements of understanding rather than conditions precedent. Paul Johnson was a policy analyst in the Governor's Office of Environmental Policy from 1983 to 1992 who was intimately involved with the Governor's consideration of the Sanctuary Act, the drafting of the Resolution, and the cooperative efforts between the State and NOAA. Johnson stated that the intent of the provisions in the Resolution was to emphasize that the designation of state lands within the Sanctuary did not transfer

state ownership or management authority over such lands. Affidavit of Paul Johnson at ¶ 13. According to Johnson, in the view of all parties involved in the December 3, 1990 meeting between state and federal officials, the provisions did not affect the inclusion of state lands within the Sanctuary or the effectiveness of the Sanctuary Act with respect to such lands. Areas within Florida waters are included in the Sanctuary and the enforcement provisions of the MPRSA are in effect. *Id.* at ¶¶ 4, 7, 8-12. This view was echoed by Helene Schwartz-Mayton who, as Assistant Attorney General in November, 1991, stated in a memo that the enforcement provisions of the MPRSA were currently in effect as to areas within Florida waters. *See* Memo of Helene Schwartz-Mayton dated November 14, 1991 at 2-4.

Additionally, both the federal and state governments have been acting as though the designation has been in effect since the effective date of the Act. Billy Causey is the current superintendent of the Sanctuary for NOAA and was, in November, 1990, immediately following passage of the Sanctuary Act, the overseer of the Sanctuary on behalf of both NOAA and the State of Florida. He stated that since December 18, 1990, when the Resolution was passed, NOAA and the State have engaged in a series of cooperative activities, including enforcement of the provisions of the MPRSA, that would be possible only if the Sanctuary designation were in effect as to both state and federal lands. *See* Billy Causey Affidavit at ¶¶ 6-12. Although this is not direct evidence regarding Governor Martinez's acceptance or rejection of the designation, it does reflect the State's view of the status of

Florida lands within the Sanctuary. It indicates that the State itself considers, and has considered for over four years, the Act to be effective as to state lands.

It appears that the State of Florida and the federal government consider the Sanctuary Act to be in effect with respect to areas within Florida waters. The evidence indicates that Governor Martinez did not object to the designation, and the Sanctuary Act became effective on the date of passage as to areas within Florida waters. Accordingly, as the parties do not dispute that Defendant M/V Jacquelyn L caused loss or injury to a sanctuary resource within the meaning of 16 U.S.C. § 1443(a)(2), it is hereby

ORDERED AND ADJUDGED that the United States' partial motion for summary judgment is GRANTED. Summary Judgment on the issue of liability *in rem* is hereby GRANTED against Defendant M/V Jacquelyn L as to Count I. It is further

ORDERED AND ADJUDGED that Defendants' motion to strike and cross-motion for partial summary judgment are DENIED.

cc:

Debra J. Kossow, Esq. John W. Costigan, Esq. Chris Fertig, Esq.