United States Court of Appeals,

Eleventh Circuit.

No. 96-8772.

Jeremy D. MARSHALL, Plaintiff-Appellant,

v.

FAIR LANES MARYLAND BOWLING, INC., d.b.a. Fair Lanes Gwinnett, Defendant-Appellee.

Aug. 7, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-CV-89-FMH), Frank M. Hull, Judge.

Before BLACK, Circuit Judge, and FAY and ALARCON[*], Senior Circuit Judges.

FAY, Senior Circuit Judge:

In this premises liability action, the district court granted defendant-appellee Fair Lanes Maryland Bowling, Inc.'s ("Fair Lanes") motion for summary judgment. In granting the motion, the district court held that under Georgia law Fair Lanes could not be held liable because plaintiff-appellant Jeremy D. Marshall's ("Marshall") injuries were the result of his own actions. Because we believe there are factual questions concerning whether Marshall's injuries were caused by his own conduct, we reverse.

BACKGROUND

This appeal arises out of an altercation that occurred on May 29, 1994, Sunday, Memorial Day weekend, at the Fair Lanes Bowling Center ("Fair Lanes") in Gwinnett County, Georgia.[1] Most of the facts surrounding the altercation are derived from Marshall's deposition testimony; those facts are mainly undisputed. In any event, to the extent any of the facts are in dispute, because we are legally obligated to resolve all ambiguities and draw all justifiable inferences in favor of the

[*]Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

[1]Defendant-appellee Fair Lanes Maryland Bowling, Inc., owns and operates the Fair Lanes Bowling Center in Gwinnett County, Georgia. For convenience, we will refer to both Fair Lanes Maryland Bowling, Inc., and the Fair Lanes Bowling Center in Gwinnett County, Georgia as Fair Lanes.

nonmoving party, *United States v. M/V Jacquelyn L.,* 100 F.3d 1520, 1522 (11th Cir.1996), we resolve all ambiguities and inferences in Marshall's favor.

At the time of the incident, Marshall worked as a cook/dishwasher for a restaurant called the Jolly Fisherman. On the fateful Sunday, Marshall had worked at the Jolly Fisherman from approximately 4 o'clock in the afternoon to 10 o'clock in the evening. During this time, he had consumed no alcohol. Upon arriving home from work at approximately 10:10, Marshall spoke to his friend Ron Ward ("Ward") on the telephone. Ward suggested they go to Fair Lanes to shoot pool and drink beer. Partly because Marshall did not have a car and Fair Lanes was within walking distance from his house and in part because Marshall did not have work on Monday, Memorial Day, Marshall agreed to meet Ward at Fair Lanes. After taking a shower and calling his then girlfriend Melissa Pauline and telling her to meet him, Ward, and Ward's girlfriend at the time, Lynn Nash ("Nash"), at Fair Lanes, Marshall walked by himself to Fair Lanes, arriving at around 10:45-11:00. Melissa Pauline drove to Fair Lanes and joined the group shortly thereafter.

Prior to entering the bar entrance to Fair Lanes,[2] Marshall noticed a Gwinnett County Sheriff Deputy sitting with his car located near the main entrance. For security reasons, Fair Lanes employed security officers during the weekend. On Fridays and Saturdays, Fair Lanes was open twenty-four hours, and on Sundays (including Sundays of holiday weekends), Fair Lanes closed between 1:00 a.m. and 2:00 a.m. On Fridays and Saturdays, officers worked from 8:00 p.m. to 4:00 a.m. While on Sundays security officers worked from 8:00 p.m. until 12:00 a.m.[3]

Upon arriving through the bar entrance, Marshall noticed that both Ward and Nash were already sitting by the bar drinking. Marshall sat next to the couple and ordered himself a beer. For about the next forty-five minutes, Marshall consumed approximately three or four beers and two shots of liquor. Marshall admits that he had a "buzz" after drinking this amount of alcohol. At approximately 11:45, the bartender announced last call and Marshall ordered another drink. Around this time, Ward left the bar to go to the bathroom; shortly thereafter Marshall followed Ward to the

---

[2]The parties refer to at least two entrances to Fair Lanes: a bar entrance and a main entrance.

[3]No security was present between midnight and closing.

bathroom.

Both Ward and Marshall left the bathroom together. As they left the bathroom, in the corridor between the bathroom and the lobby of the bowling alley, a "young man"[4] with a "big thick gold necklace around his neck" confronted Ward, asking him: "[H]ow do you like my necklace?" Ward responded: "I don't like your necklace ... it's ugly. I don't like it. I wouldn't wear it." The young man then told Ward that he was going to put some green emeralds in the eyes of the charm that hung from the necklace, and asked Ward: "You'll like it then, won't you?" Ward replied: "[L]ook, I told you I don't like it. I wouldn't wear it."

After Ward's last response, the young man started to get mad; Ward also got angry. In an attempt to stop a potential fight, Marshall stepped in between Ward and the young man and told Ward: "[H]ey, so what? He's got an ugly necklace. Let's go back. The girls are waiting on us. You know, let's go back." Marshall then told the young man: "[H]e [Ward] doesn't like your necklace. Just leave it alone. It's no big deal."

At the moment of Marshall's last response to the young man, a second male approached Marshall and pushed Marshall away from Ward and the young man stating: "[H]ey man, why do you want to get between my buddy and his fight?" Marshall answered: "I just told them it's a stupid idea in the first place, he's got an ugly necklace, he [Ward] doesn't like it, so what? Let's just forget about it and go." At this point, Marshall and Ward started to walk back to the bar where their girlfriends were waiting.

Before making it halfway back to the bar, Marshall and Ward were confronted by five males. Two of the five were the same two men Marshall and Ward had encountered in the corridor outside of the bathroom. According to Marshall, all five males were dressed in "ganglike" fashion; they wore very baggy clothes, the waistlines on their pants hung low, and they wore large tee shirts.

The young man wearing the necklace again questioned Ward by saying: "[S]o you don't like my necklace, huh?" Ward responded: "[L]ook, I already told you once I don't like your necklace.

---

[4]According to Marshall's deposition testimony, the young man was approximately sixteen or seventeen years old.

I don't care what you think I think about it."

At this same time, the second man asked Marshall:  "[S]o you want to step between my buddy and his business, huh?"  Marshall replied:  "[L]ook, it's no big deal, so what?  Let's just forget about it."  While Marshall was talking to the second man, Ward and the first young man started to push each other.  Marshall glanced at the commotion, and then quickly looked back to make sure that "he wasn't going to start pushing me or something."  During this moment, one of the three other men who had previously been uninvolved struck Marshall.  Marshall fell to the floor, where he was kicked repeatedly in his head and back until he found refuge under a table.

After being helped to his feet by a stranger, Marshall walked straight to the bar, where his girlfriend, Melissa Pauline was still waiting.  Marshall asked Melissa to drive him to the hospital.  Melissa concerned with driving because she had been drinking, suggested they look for the security officer or "bowling alley cop."  Marshall agreed.  Although they both looked for the security officer, he was never found.  Melissa then drove Marshall to a hospital.

Upon arriving at the hospital, Marshall's blood was drawn, his blood alcohol level was .215, a level more than twice the legal limit to drive a vehicle.  Marshall had sustained a severely broken jaw and several displaced teeth.  He had surgery to fix his jaw and was released from the hospital three days later.

Subsequently, Marshall filed a premises liability suit against defendant Fair Lanes Maryland Bowling, Inc., in the State Court of Fulton County, Georgia.  Specifically, Marshall's Complaint alleged that defendant was liable to him because Fair Lanes:  (1) did nothing to prevent, deter, or stop the attackers from beating him, (2) despite having actual and constructive notice of similar events taking place on the premises, failed to take any precautions or implement preventive measures to prevent this type of injury, (3) knew or should have known of the dangerous conditions that existed on the premises, (4) failed to warn Marshall of potential injury and danger, and (5) negligently failed to provide security measures to prevent the altercation from happening.

To support his allegations, Marshall later produced evidence of at least three prior criminal incidents occurring at Fair Lanes.  For example, in one incident an invitee was beaten with a

baseball bat by three assailants. A second incident involved a gang related drive-by shooting with bullets entering Fair Lanes.

After the case was removed to federal court based on diversity jurisdiction, and following discovery, Fair Lanes filed a motion for summary judgment. Fair Lanes contended that Marshall assumed the risk of his injuries by voluntarily involving himself in the altercation, and consequently, because Marshall's conduct was the sole proximate cause of his injuries, Fair Lanes was entitled to judgment as a matter of Georgia law.

The district court granted Fair Lanes' motion, finding that "[t]he facts in this record demonstrate that [Marshall's] injuries are the result of his own actions and [Fair Lanes] is not liable, under Georgia law, for the folly of [Marshall's] actions." R2-28-6. The district court then entered final judgment. Marshall timely appealed.

On appeal, Marshall claims primarily that the district court erred in granting Fair Lanes' motion for summary judgment because there are genuine issues of material fact as to whether Marshall assumed the risk of his injuries by engaging in mutual combat. For the reasons that follow, we agree with Marshall that there are questions of fact concerning whether Marshall's injuries were caused by his own actions. Accordingly, we reverse the district court's order granting Fair Lanes' motion for summary judgment.

## STANDARD OF REVIEW

We review *de novo* the district court's order granting summary judgment. *Harris v. Board of Educ. of the City of Atlanta,* 105 F.3d 591, 595 (11th Cir.1997). A motion for summary judgment may be granted only if no genuine dispute remains as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In making this determination, the Court must examine the pleadings, affidavits and other evidence in the record "in the light most favorable to the non-moving party." *Retina Associates, P.A. v. Southern Baptist Hosp. of Florida, Inc.,* 105 F.3d 1376, 1380 (11th Cir.1997).

## ANALYSIS

Under Georgia law, a landowner is liable to invitees "for injuries caused by his failure to

exercise ordinary care in keeping the premises and approaches safe." GA. CODE ANN. § 51-3-1 (1982); *see also Confetti Atlanta, Ltd. v. Gray,* 202 Ga.App. 241, 414 S.E.2d 265, 266 (1991) ("The true ground of liability of the owner of property to an invitee who is injured thereon is the superior knowledge of the proprietor of the existence of a condition that may subject the invitee to an unreasonable risk of harm."). For example, "[i]f the proprietor has reason to anticipate a criminal act, he or she then has a "duty to exercise ordinary care to guard against injury from dangerous characters.' " *Lau's Corp. v. Haskins,* 261 Ga. 491, 405 S.E.2d 474, 476 (1991)(quoting *Atlantic Coast Line R.R. Co. v. Godard,* 211 Ga. 373, 86 S.E.2d 311, 315 (1955)).

A landowner, however, is not the insurer of his invitee's safety. *Howell v. Three Rivers Sec., Inc.,* 216 Ga.App. 890, 456 S.E.2d 278, 280 (1995). In cases where a plaintiff/invitee (1) has superior knowledge of the existence of a condition that may subject the invitee to an unreasonable risk of harm, *Howell v. Three Rivers Sec., Inc.,* 216 Ga.App. 890, 456 S.E.2d 278 (1995), (2) voluntarily joined an ongoing altercation and engaged in mutual combat, *Sailors v. Esmail Intern., Inc.,* 217 Ga.App. 811, 459 S.E.2d 465 (Ga.Ct.App.1995), or (3) assumed the risk of his injuries by voluntarily entering a fight, *Fagan v. Atnalta, Inc.,* 189 Ga.App. 460, 376 S.E.2d 204 (1988), Georgia courts have held that a proprietor has no duty to protect the plaintiff/invitee.

Relying on these Georgia common law principles, Fair Lanes contends that the undisputed evidence illustrates that by voluntarily participating in the altercation Marshall had superior knowledge of the risk and/or assumed the risk. Because both parties and the district court mainly rely on the three cases listed above and *Bishop v. Fair Lanes Georgia Bowling, Inc.,* 803 F.2d 1548 (11th Cir.1986), we discuss these cases in more detail.

In *Howell v. Three Rivers Sec., Inc.,* 216 Ga.App. 890, 456 S.E.2d 278 (Ga.Ct.App.1995), plaintiff was injured in a bar when he got in a fight with three individuals. Two of the three individuals, Bennett and Morriss, had been permanently banned from the bar prior to the night the fight occurred because of previous fights. Several weeks prior to the bar fight, plaintiff had been threatened personally by Bennett.

On the night of the fight, plaintiff, while at the bar, knew both Bennett and Morriss were also

at the bar. Indeed, plaintiff saw Bennett and told some friends to "watch his back" for him. Plaintiff then told his date he wanted to leave, but instead of leaving, decided to dance one more dance. Plaintiff stated that he purposely tried to dance close to a security guard for further protection.

While dancing his last dance, plaintiff saw Bennett and the other two individuals coming toward him. Not waiting to get hit, plaintiff put Bennett in a headlock. During the ensuing fight, plaintiff injured his knee and got kicked in his head. Plaintiff then filed a premises liability suit against the bar and the security agency that provided security for the bar. In the complaint, plaintiff alleged that both defendants should have known of Bennett and Morriss' propensity for violence and were negligent by allowing them to enter the bar and for failing to protect him from these individuals. Both defendants filed motions for summary judgment, which the trial court granted. On appeal, the court of appeals affirmed.

In affirming, the court of appeals agreed with plaintiff that the defendants breached their duty towards plaintiff by admitting Bennett and Morriss into the bar, when the two had been permanently banned. However, the court stated that "breach of duty alone does not make a defendant liable in negligence. The rule remains that the "true ground of liability ... is the *superior* knowledge of the proprietor of the existence of a condition that may subject the invitee to an unreasonable risk of harm.' " *Id.* at 280 (quoting *Pound v. Augusta Nat'l, Inc.,* 158 Ga.App. 166, 279 S.E.2d 342, 344 (1981)).

The court of appeals found that plaintiff's act of knowingly dancing next to a security guard for protection illustrates plaintiff's superior knowledge of the dangers that confronted him. For that reason, the court ruled that defendants' breach of duty was not the proximate cause of plaintiff's injuries. Thus, the court of appeals held that summary judgment was properly entered by the trial court.

We note that two judges dissented to the *Howell* opinion. The two judges believed summary judgment was improper because an issue of fact remained as to whether defendants or plaintiff had the superior knowledge of the potential danger. To support its reasoning, the dissent pointed to testimony from a security officer of the bar who admitted that she knew Bennett and Morriss were

in the bar, despite their permanent ban. Utilizing this evidence, the dissent would have denied the motion for summary judgment and allowed a jury to determine whether plaintiff or the defendants had the superior knowledge.

In the next case, *Sailors v. Esmail Intern., Inc.,* 217 Ga.App. 811, 459 S.E.2d 465 (1995), plaintiff was injured in a fight that occurred in the parking lot of a bar called the T-Bird's Lounge. After leaving the Lounge, plaintiff's friend, Roberts, urinated in the Lounge's parking lot. A passing car took offense towards Roberts' actions and drove into the parking lot. The two men inside the passing car exited the car and began cursing Roberts. Roberts returned some obscenities to the two men. Roberts and the two men then confronted one another.

On two occasions, an independent bystander persuaded both sides to go their separate ways. Despite the bystander's efforts, Roberts made additional comments, at which point, one of the two men opened the trunk of the car to retrieve a pool cue. At this point, plaintiff who had been sitting in his truck, exited his truck in an attempt to defuse the situation. During his attempt to defuse the situation, plaintiff unexplainably made some derogatory comments about one of the men's girlfriends. The man holding the pool cue took a swing at plaintiff, but plaintiff was able to wrestle the pool cue away. After obtaining the pool cue, plaintiff then chased the two men back to their car and broke the driver's side window of the passing car with the pool cue. In an ensuing scuffle, plaintiff was stabbed with a knife by one of the men.

Plaintiff filed suit against the bar to recover damages from the injuries he received in the fight. A jury trial was held and a verdict was entered in favor of the bar. Plaintiff appealed. On appeal, plaintiff contended that the trial court erred in excluding evidence of police incident reports. The trial court's basis for the exclusion of the incident reports was that the reports were not substantially similar to the incident that occurred in the parking lot.

In holding that the trial court did not abuse its discretion in excluding the reports, the court of appeals also found that the incidents were not substantially similar to the parking lot altercation. While discussing the evidentiary rulings, the court of appeals commented on mutual combat and the relevancy of prior criminal incidents:

> In a case of mutual combat, the superior knowledge must always remain with the combatants, as they, by their voluntary participation, have selected the time, date, and place for the altercation. Any injuries to the combatants [in this case] resulted from their own conduct and under such circumstances, the existence of prior criminal acts on the premises is irrelevant and cannot form a basis for liability on the premises owner.

*Id.* at 468. The court of appeals added that plaintiff "voluntarily joined an ongoing altercation and engaged in mutual combat. The proprietor had no duty to protect the plaintiff from himself. In fact, it is the plaintiff who had a duty of ordinary care for his own safety." *Id.*

The next case we consider is *Fagan v. Atnalta, Inc.,* 189 Ga.App. 460, 376 S.E.2d 204 (1988). *Fagan* involves a plaintiff who voluntarily intervened in a fight between a female bartender, a waitress, and a rowdy group of men. The bartender, while forcing the group of men to leave the bar, was grabbed by one of the men by her collar. Plaintiff, who had slowly ventured towards the group of men, grabbed the bartender from the rear to keep her from being pulled outside the bar with the men. The men, unhappy with plaintiff's actions, grabbed plaintiff and took him outside where he was severely beaten. The bartender admitted she never asked plaintiff for his help.

Plaintiff filed suit against the bar alleging the bar was negligent in failing to provide for the safety and security of its patrons, despite having a history of prior incidents at the bar. Defendant filed a motion for summary judgment, arguing that the plaintiff had equal knowledge of prior incidents and that the plaintiff, by voluntarily acting in view of that knowledge, assumed the risk of his injuries. The trial court agreed with defendant and granted the motion for summary judgment. Plaintiff appealed. The Court of Appeals of Georgia affirmed.

In its affirmance, the court of appeals started with the premise that summary judgment is not ordinarily granted on issues of negligence and assumption of the risk. However, in this case, the court of appeals thought summary judgment was proper because "appellant saw and recognized the risk, and deliberately interjected himself into the affray after the bartender was grabbed by a customer being ejected. Appellant obviously assumed the risk of injury by voluntarily confronting four rowdy customers being ejected from a bar by management." *Id.* at 206.

Three judges dissented from the affirmance of the trial court's order granting summary judgment. Two judges believed that a jury should have decided whether plaintiff or defendant had

the superior knowledge of the bar's dangerous conditions and whether plaintiff assumed the risk or was attempting to rescue the bartender.

The last case we discuss is *Bishop v. Fair Lanes Georgia Bowling, Inc.,* 803 F.2d 1548 (11th Cir.1986), in which this Court reversed a district court's order granting summary judgment. In *Bishop,* plaintiffs were bowling at the same Fair Lanes' bowling center as the one involved in our appeal. While bowling at Fair Lanes, plaintiffs noticed that they were missing their pitcher of beer. A plaintiff approached three bowlers on the adjoining lane as to the whereabouts of the missing pitcher. The three intoxicated bowlers took umbrage with the questioning and confronted plaintiffs. The heated confrontation lasted somewhere between several minutes to half an hour.

Following the confrontation, two members of plaintiffs' group went to the front counter of Fair Lanes to tell the manager on duty what had transpired and to request that the manager keep an eye on the three bowlers. Throughout the rest of the evening, the three bowlers verbally harassed plaintiffs until Fair Lanes closed. At this point, one of the three bowlers continued to berate plaintiffs, stating that if someone took his beer or tried to harm his friends he would "beat ass." Rather than leave when the three bowlers left, plaintiffs purposely decided to wait a few minutes in hopes of avoiding further confrontation outside in the parking lot. When plaintiffs eventually left, a fight occurred in the parking lot between plaintiffs and the three bowlers. One plaintiff was severely beaten in the fight. Subsequently, plaintiffs filed a premises liability suit against Fair Lanes.

Defendant filed a motion for summary judgment, which the district court granted. On appeal, this Court reversed. Setting forth principles of Georgia tort law, we found that in order for a proprietor's duty of care to attach, the dangerous condition "must be apparent or foreseeable, and not the result of sudden unexpected actions." *Id.* at 1551. Consistent with this principle, we found that if the three bowlers' violent actions were foreseeable to Fair Lanes and Fair Lanes did nothing to prevent the fight, then Fair Lanes would be liable. *Id.*

Applying the *Bishop* facts to the foreseeability element of plaintiffs' cause of action, we reversed the district court's order granting defendant summary judgment because we found:

> It will be for the jury to decide if the physical assault in this case was a sudden act taken without warning to Fair Lanes or the culmination of an evening's worth of confrontation, taunting and harassment and that Fair Lanes was made aware of the conflict well before it erupted into physical violence.

*Id.*

Having set forth in detail the facts and holdings of the four cases relevant to our decision, we now discuss how these cases compare and relate to the case before us, and why we ultimately believe the district court erred in granting Fair Lanes' motion for summary judgment.

In its order granting summary judgment, the district court cited and quoted *Sailors v. Esmail Int'l, Inc.,* 217 Ga.App. 811, 459 S.E.2d 465, 468 (1995) for the proposition that because Marshall chose to participate in the altercation, Fair Lanes' knowledge of prior criminal incidents is irrelevant. Pursuant to *Sailors,* in order for the prior criminal incidents to be considered irrelevant, the district court, in the summary judgment posture, must initially find from the record that the undisputed facts demonstrate Marshall voluntarily participated in the altercation.

In granting Fair Lanes' motion, the district court found as a matter of undisputed fact that Marshall's injuries were the result of his own conduct. The district court found that Marshall "chose to interject himself into a dispute between Ward and an unknown individual." For instance, the district court factually found that Marshall, under the influence of alcohol, escalated the confrontation by twice commenting that the young man's necklace was ugly, despite knowing that Ward's very same comments about the necklace were the basis for the confrontation. The district court further found that the brief temporal break between the first verbal incident outside of the bathroom and the second physical incident in the middle of the bowling center was insignificant.

> Having chosen to insult the young man, [Marshall] and Ward sought to make good their retreat. They did not get far, and the fact that the fight occurred in the middle of the pool hall instead of at the edge of the restroom is of little relevance, given the short interval between the two encounters. The course of events demonstrate one continuous unbroken chain of events. Thus, [Marshall's] actions just outside the restroom are traceable directly to the fight seconds later in the middle of the bowling alley.

R2-28-6-7.

While Marshall's injuries may have been caused by his own actions, in the summary judgment context, this factual finding must be undisputed. In other words, to grant Fair Lanes'

motion, there cannot be any questions of material fact as to whether Marshall voluntarily participated in the altercation or assumed the risk of his injuries by choosing to join the encounter. Our review of the record, leads us to conclude that whether Marshall voluntarily participated and/or assumed the risk of his injuries in an altercation with five young males is a factual question better left for a jury to decide.

In support of our conclusion, we emphasize the differences between the two incidents that occurred. In the first incident, Marshall and Ward engaged in a verbal confrontation with two young males, in the corridor, outside of the Fair Lanes' bathroom. While Marshall's comments during the first incident can be interpreted as escalating a tense situation, as the district court found, we believe Marshall's comments equally could be construed as an attempt to defuse a tense situation.

The district court specifically found that Marshall's comments that the necklace was ugly "flamed the emotions of the participants and led to the fight moments later." However, as the district court notes and Marshall states, his comments about the necklace were directed towards Ward, in an attempt to calm Ward down. We are cognizant of the fact that Marshall's comments were made in the presence of the angry young man, but whether Marshall's comments and conduct (construed in a light most favorable to Marshall) led to the altercation or was an attempt to prevent an altercation is a question for the jury to decide. When directly speaking to the young man, Marshall did not make any provocative comments about the necklace, "[Ward] doesn't like your necklace. Just leave it alone. It's no big deal." Marshall's direct comments towards the young man can be construed as an effort to avoid a confrontation. We are convinced that questions of fact exist, as to whether Marshall through his comments and conduct, voluntarily participated in the altercation or attempted to defuse the situation.

More significant, is the brief temporal break between the first incident and the second incident. Regardless of the amount of time between the two incidents, the incidents are isolated and separate. The facts illustrate that Ward and Marshall walked away from the bathroom incident without getting into a fight. By walking away, instead of fighting, Marshall's conduct demonstrates a willingness to avoid confrontation and not to engage in mutual combat.

Our most convincing reason that we believe questions of fact exist as to whether Marshall voluntarily participated in the altercation are the circumstances surrounding the second incident. The second incident took place in the middle of the bowling alley a few moments following the bathroom incident. On their way back to the bar, Marshall and Ward were confronted by the two men they had encountered outside the bathroom plus three more young men. All five males formed a line stopping Ward and Marshall. The two young males outside the bathroom again started questioning both Ward and Marshall. In this second incident, we do not believe the uncontested facts depict Marshall as a voluntary participant in the fight.

As the court of appeals stated in *Sailors,* in a case of mutual combat, the combatants "by their voluntary participation have selected the time, date, and place for the altercation." In our case, we cannot find as a matter of law that Marshall voluntarily selected the time and place for the altercation. Indeed, we find it more likely that when confronted by five males, Marshall would have preferred to avoid the altercation. During this incident, Marshall's only comments were: "[L]ook, it's no big deal, so what? Let's just forget about it." These comments do not indicate to us that Marshall assumed the risk of his injuries by engaging in the fight. In any event, if there is a serious question as to whether Marshall attempted to avoid the fight or voluntarily chose to fight, this precludes the entry of summary judgment.

Our decision is supported by the cases cited and relied on by both the parties and the district court. In *Howell,* plaintiff knowingly remained at the bar despite knowing of the dangerous conditions. Furthermore, when plaintiff was confronted, plaintiff initiated the altercation. In *Sailors,* plaintiff voluntarily exited his car to join the affray, and then, while holding a pool cue, chased two of the combatants to their car and smashed a window. *Fagan* involves a plaintiff who voluntarily interjected himself into an altercation between a bartender and a rowdy group of men. In all of these cases, the facts depict plaintiffs, who through their actions, voluntarily participated in fights and assumed the risks of their injuries. These plaintiffs made little attempt to defuse the situation or to avoid an altercation.

In our case, unlike *Howell, Sailors,* and *Fagan,* Marshall's conduct and comments could be

interpreted as an attempt to avoid a confrontation.  We cannot find as a matter of law that Marshall(along with Ward) chose to fight five men.  At the very least, we believe that sufficient evidence was presented to justify submission of the issue to the jury.

CONCLUSION

For the foregoing reasons, we conclude that there are genuine issues of material fact precluding the entry of summary judgment.  Accordingly, the judgment of the district court is REVERSED.