[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-15305

_____

D.C. Docket No. 98-02671 CV-T-23B

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 16, 2001
THOMAS K. KAHN
CLERK

TUG ALLIE-B, INC., a corporation, as owner
of the tug Allie B, a commercial tug boat,
official document number 524008,
DANN OCEAN TOWING, as operator of said
vessel, in a cause of action for exoneration
from or limitation of liability,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

Claimant-

Appellee,

ALLIED TOWING CORP.,

Claimant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(November 16, 2001)**

Before BLACK and BARKETT, Circuit Judges, and TIDWELL[*], District Judge.

BARKETT, Circuit Judge:

Tug Allie-B, Inc., and Dann Ocean Towing, Inc. (collectively "Tug Allie") appeal an order declaring that claims by the United States brought pursuant to the Park System Resources Protection Act, 16 U.S.C. § 19jj et seq. ("PSRPA"), for damages caused by the tug Allie-B to a coral reef while towing a barge owned by Allied Towing Corporation ("Allied"), are not subject to the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 181 et seq. ("Limitation Act"). The question of whether the United States' claims brought pursuant to PSRPA are subject to the Limitation Act is one of first impression.

## BACKGROUND

On July 20, 1998, the tug Allie-B, a commercial tug boat towing Allied's 354-foot barge, ATC-350, ran aground and collided with coral reefs in the vicinity of Ledbury Reef in Biscayne National Park ("National Park"). The tug managed to power itself off the reef, but, in doing so, caused a crater-like blow hole in the ocean floor. The tug boat then pulled the barge free from its grounded position atop the reef. The grounding of the tug boat and barge, and the efforts to remove them from the reef,

---

[*] Honorable G. Ernest Tidwell, U.S. District Judge for the Northern District of Georgia, sitting by designation.

caused significant injury to natural resources located within the National Park. The hulls of both vessels, and the cable connecting the vessels, destroyed extensive tracts of coral reef, including hard and soft corals and reef framework.

After the collision, Tug Allie-B, Inc., as owner of the tug boat, and Dann Ocean Towing, Inc. ("Dann Towing"), as operator of the tug boat, filed a petition for exoneration from or limitation of liability, pursuant to the Limitation Act, for damages arising out of the grounding of the tug boat and barge. The Limitation Act limits a vessel owner's liability for any damages arising from a maritime accident to the post-accident value of the vessel and its pending freight. 46 U.S.C. § 183(a).[1] Tug Allie alleged that the post-accident value of the vessel and pending freight amounted to $1,204,860 which would limit liability to that amount pursuant to the Limitation Act.[2]

---

[1] The Limitation Act provides, in relevant part:

> The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

46 U.S.C. § 183(a). See also Hartford Acc. & Indem. Co. of Hartford v. Southern Pac. Co., 273 U.S. 207, 214 (1927) ("liability as owner shall be limited to the value of the vessel as appraised after the occurrence of the loss and the pending freight for the voyage").

[2] When faced with liability for a maritime accident, a vessel owner may file a petition in federal court seeking protection under the Limitation Act. In re: Beiswinger Enters. Corp., 86 F.3d 1032, 1036 (11th Cir. 1996). If the limitation is granted, and the vessel owner subsequently is found liable, the admiralty court distributes the limitation fund among the damage claimants in

The United States and Allied filed an Answer to the limitation claims and filed their own claims for damages against Tug Allie in an amount that exceeded the limitation fund by approximately $2,864,340. Allied sought $1,000,000 for damages incurred as a result of the grounding of its barge. The United States sought $3,069,200 in damages, claiming that, pursuant to the PSRPA, it was entitled to all damages due to injuries to resources in the National Park as a result of the grounding.[3] The relevant provisions of the PSRPA include:

16 U.S.C. § 19jj-1(a):

[A]ny person who destroys, causes the loss of, or injures any park system resource is liable to the United States for the response costs and damages resulting from such destruction, loss, or injury.

16 U.S.C. § 19jj-1(b):

[a]ny instrumentality, including but not limited to a vessel, vehicle, aircraft, or other equipment that destroys, causes the loss of, or injures any park system resource or any marine or aquatic park resource shall be

---

an equitable proceeding known as concursus. Id. at 1036. Claimants asserting valid claims receive a pro rata distribution of the fund deposited or secured, or the proceeds of the vessel and pending freight. Supp. Adm. R. F(8). See also Bouchard Transp. v. Updegraff, 147 F.3d 1344, 1347 (11th Cir. 1988). As limitation is based on the post-accident value of the vessel and its freight, damages can be significantly limited, especially in cases in which the vessel sinks or the freight is lost. The court "may enter judgment in personam against the owner as well as judgment in rem against the res, or the substituted fund." Hartford Accident & Indemnity Co. of Hartford, 273 U.S. at 215.

[3] Although the United States has subsequently amended its damages figure to $2,000,000, the combined amount sought by the United States and Allied still exceeds the limitation fund by a substantial amount. In amending its complaint, the United States also added Allied as a defendant.

liable in rem to the United States for response costs and damages resulting from such destruction, loss, or injury to the same extent as a person is liable under subsection (a) of this section.

16 U.S.C. § 19jj(c):

"Response costs" means the costs of actions taken by the Secretary of the Interior to prevent or minimize destruction or loss of, or injury to, park system resources; or to abate or minimize the imminent risk of such destruction, loss, or injury; or to monitor the ongoing effects of incidents causing such destruction, loss or injury.

16 U.S.C. § 19jj(b):

"Damages" includes the following:
(1)    Compensation for -
    (A)    (i)    the cost of replacing, restoring, or acquiring the equivalent of a park system resource; and
        (ii)    the value of any significant loss of use of a park system resource pending its restoration or replacement or the acquisition of an equivalent resource, or
    (B)    the value of the park system resource in the event the resource cannot be replaced or restored.
(2)    The cost of damage assessments under section 19jj-2(b) of this title.

The district court determined that the Government's claims under the PSRPA are not subject to the Limitation Act, and the United States would be entitled to a complete recovery of its damages, if proven. This appeal followed.[4] Because the district court's ruling involved purely an issue of law, that is, statutory construction,

---

[4] We deny Tug Allie's motion to strike the brief of Appellee Allied. Allied's brief simply adopts the United States' brief in its entirety; it makes no separate arguments.

we review its determination de novo.  Marine Trans. Serv. Sea Barge Group, Inc. v. Python High Performance Marine Group, 16 F.3d 1133, 1138 (11th Cir. 1994).

## DISCUSSION

Tug Allie argues on appeal that the Limitation Act and the PSRPA can be read harmoniously by holding that although claims can be brought under the PSRPA, damages would be limited in accordance with the Limitation Act.  The Government argues that both the relevant statutory language and the congressional intent underlying the statutory schemes reflect a clear conflict that cannot be reconciled without limiting one statutory enactment to accommodate the other.  Because the PSRPA is the later-enacted statute, as well as the more specific, the Government argues that the conflict must be resolved by applying the PSRPA without limiting its claims for damages pursuant to the Limitation Act.

To resolve the issue presented, we employ the fundamental principles of statutory construction.  See, e.g., K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").  Additionally, we follow the long established rule, that "a new[er] statute will not be read as wholly or even partially amending a prior one unless there exists a positive repugnancy between the provisions of the new and those of the old

6

that cannot be reconciled." Regional Rail Reorganization Act Cases, 419 U.S. 102, 133-34 (1974). Stated alternatively, "[c]ourts generally adhere to the principle that statutes relating to the same subject matter should be construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones." Southern Natural Gas Co. v. Land, Cullman County, 197 F.3d 1368, 1373 (11th Cir. 1999) (quotations and citations omitted). Consistent with this view, we begin by reviewing the language of both the PSRPA and the Limitation Act, and then examine the purpose and structure of each Act to determine whether the two Acts can be read harmoniously or if when read together they present "a positive repugnancy" or conflict that cannot be reconciled. Regional Rail Reorganization Act Cases, 419 U.S. at 134. The starting point for all statutory interpretation is the language of the statute itself. Federal Reserve Bank of Atlanta v. Thomas, 220 F.3d 1235, 1239 (11th Cir. 2000). We note first that there is nothing in the language of the PSRPA which suggests that any damages under the Act should be in any way limited. To the contrary, the PSRPA expressly speaks to the liability for "response costs and damages" in terms of making the government whole for all of its losses. Response costs are those taken to prevent, abate or minimize any injury, or imminent risk of injury, to park system resources, as well as whatever costs are incurred to monitor the ongoing effects of incidents causing destruction, loss or injury. See 16 U.S.C. §

7

19jj(c). Damages include compensation for replacing, restoring, or acquiring the equivalent of a park system resource or its value; for the loss of use until the restoration, replacement or acquisition of an equivalent resource is accomplished; and for the cost of damage assessments under section 19jj-2(b). See 16 U.S.C. § 19jj(b). As the above language shows, the measure of damages under the PSRPA is defined solely by reference to the damage an entity has inflicted on the park land at issue, and secondary losses stemming from that injury. Nothing in the statute suggests that the damages are capped by any external factor. Therefore, in the absence of any explicit statutory language limiting damages under the PSRPA, we conclude that Congress contemplated that the Government could seek full recovery under the statute for accidents causing injury to park lands.

On the other hand, the language of the Limitation Act provides for a limitation on the total of all recoverable damages in a marine accident to the post-accident value of the ship and its cargo, no matter how many claimants there may be. See 46 U.S.C. § 183(a). See also Hartford Accident & Indemnity Co. of Hartford, 273 U.S. at 214 ("liability as owner shall be limited to the value of the vessel as appraised after the occurrence of the loss and the pending freight for the voyage"). Accordingly, application of the Limitation Act here, in a case where a ship has destroyed Government park land, would prevent the United States from recovering all of the

costs itemized as damages under the PSRPA. Indeed, in some circumstances, the Limitation Act's application would result in the inability of the United States to recover any of the PSRPA damage remedies, such as when the ship causing the damage is a total loss, rendering its post-accident value as zero. Therefore, on review of the plain language of the PSRPA and the Limitation Act we conclude that the statutes present a conflict regarding the scope of a defendant's liability when the Government sues the defendant for allowing a marine vessel to injure park land.

Close reading of the two statutes reveals even more central conflicts, as each is based upon a fundamentally different theory of liability, and each is governed by different rules controlling which assets a finding of liability will attach. Beginning with the theory of liability, we note that the PSRPA is in effect a strict liability statute, with statutorily defined defenses.[5] 16 U.S.C. § 19jj-1(c). Specifically, under the PSRPA, a defendant can avoid liability for damages only if "(1) the destruction, loss of, or injury to the park system resource was caused solely by an act of God or an act of war; (2) such person acted with due care, and the destruction, loss of, or injury to

---

[5] As this is the first case addressing the PSRPA, this Circuit has not held previously that the PSRPA is a strict liability statute. However, the in personam liability provision of the PSRPA is substantially the same as that of the Marine Protection, Research and Sanctuaries Act ("MPRSA"), compare 16 U.S.C. §19jj-1(a) with 16 U.S.C. §1443(a)(1), and this Circuit has held that the MPRSA imposes strict liability. See United States v. M/V JAQUELYN L., 100 F.3d 1520, 1521 (11th Cir. 1996). Accordingly, viewing the language of the PSRPA, and using this Circuit's analysis of the language of the MPRSA, we conclude that the PSRPA is a strict liability statute.

9

the park system resource was caused solely by an act or omission of a third party, other than an employee or agent of such person; or (3) the destruction, loss, or injury to the park system resource was caused by an activity authorized by Federal or State law." 16 U.S.C. § 19jj-1(c). In contrast, the Limitations Act is typically applied when the claim at issue is based on a theory of negligence. In re Beiswenger Enters. Corp., 86 F.3d at 1036 (noting that in a limitation proceeding under the Limitation Act, the court engages in a two-step analysis with the first being a negligence or unseaworthiness finding and the second being the privity or knowledge of the vessel owner). Indeed, all of the cases Tug Allie identifies to support its view that the Limitation Act could limit PSRPA liability concern maritime statutes that are based in negligence, and thus a vessel owner can seek to limit or avoid liability depending on whether he or she was at fault. See, e.g., 46 U.S.C. § 688, ("The Jones Act"), 46 U.S.C. App. § 761 et. seq. ("The Death on the High Seas Act") ("DOHSA"), & 46 U.S.C. App. § 190 et seq., ("The Harter Act").[6]

---

[6] See DOHSA, 46 U.S.C. §§ 761 and 766 (imposing liability when death caused by "wrongful act, neglect, or default occurring on the high seas" and mandating that a court "reduce the recovery" when "decedent has been guilty of contributory negligence"); Harter Act, 46 U.S.C. § 192 (providing that vessel owners can limit liability if they "exercise due diligence"); Jones Act, 46 U.S.C. § 688. See also Thomas J. Schoenbaum, Admiralty and Maritime Law, 3rd Ed., at 490 (2001) ("Liability [under the Jones Act] depends on proving negligence."));

Also, as noted above, the Harter Act specifically preserves a vessel owner's right to limitation. See 46 U.S.C. § 196.

The Longshoreman and Harbor Workers Compensation Act, 33 U.S.C. §§ 901-950 ("LWHCA"), is the only other act relied upon by Tug Allie. At first glance, the LWHCA may appear analogous, as it establishes a no-fault scheme. In fact, however, the LWHCA establishes

Relatedly, because the PSRPA is a strict liability statute that looks only to the cause of the damage, it only permits only a very limited number of defenses, as is customary with strict liability statutes. See, e.g., Clean Water Act, 33 U.S.C. § 1321(f); Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9607-9675. Indeed, the legislative history of the PSRPA suggests that defenses under the Act were intended to be narrow and exclusive.[7] See Senate Comm. on Energy & Nat. Res., S. Rep. No. 328, 101st Cong., 2d Sess. 1, reprinted in 1990 U.S.C.C.A.N. 603, 605 (1990). The Supreme Court has held that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17 (1980). This recognition presents another source of conflict, for if we applied the

_____

a no-fault scheme with respect to employer liability, and it further provides a statutory cause of action for negligence against third party vessel owners. See 33 U.S.C. § 905(b). Thus, it is distinguishable from the PSRPA.

[7] Similarly, courts have held that the enumerated defenses of other strict liability schemes are exclusive and should be narrowly construed. See, e.g., United States v. West of England Ship Owner's Mutual Prot. & Indem. Assoc., 872 F.2d 1192, 1200 (5th Cir. 1989) (Clean Water Act defendants have burden of proof that one of the four liability exceptions exists; these exceptions must be narrowly construed); Levin Metals Corp. v. Parr-Richmond Terminal Co., 799 F.2d 1312, 1316-17 (9th Cir. 1986) (CERCLA statutory defenses exclusive); Steuart Transp. Co. v. Allied Towing Corp., 596 F.2d 609 (4th Cir. 1979) (shipowner may only recover costs under Clean Water Act if discharge was due to one of the causes that would excuse all liability); United States v. Price, 577 F. Supp. 1103, 1113-14 (D.N.J. 1983) (CERCLA intended to impose strict liability subject only to listed affirmative defenses).

Limitation Act to PSRPA claims, we would effectively incorporate its defenses into the PSRPA.

The last conflict between the statutes is perhaps the greatest: the PSRPA and the Limitation Act provide for different attachment rules upon a finding of liability. Specifically, the PSRPA holds a party responsible in personam *or* in rem for "response costs and damages." 16 U.S.C. § 19jj-1(a) and (b).[8] Therefore, to establish liability, the PSRPA looks to the cause of the injuries to the park resources, and may hold the responsible person or instrumentality liable for damages which have no relation to the value of the instrumentality causing the injury. 16 U.S.C. § 19jj(a) and (b). In contrast, under the Limitation Act, a defendant can avoid or limit liability by demonstrating a lack of privity or knowledge of the negligence or unseaworthiness of the vessel. See Hercules Carriers, 768 F.2d at 1563-64 (In a limitation proceeding, the court undertakes the following analysis: "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness.") (internal quotations and citation omitted); see also In re Beiswenger Enters. Corp., 86 F.3d at 1036; Farrell Lines Inc.

_____

[8] Moreover, the in rem liability provision of the PSRPA imposes liability to "the same extent as" is imposed in personam. 16 U.S.C. § 19jj-1(b). This further suggests that the PSRPA conflicts with any statute, including the Limitation Act, that attempts to limit liability to the value of the vessel or instrument that causes the destruction or injury to park system resources.

v. Jones, 530 F.2d 7 (5th Cir. 1976).

In other words, even if the judgment is in personam, under the Limitation Act, the amount of the judgment is limited to the post-accident value of the res causing the damage. As noted earlier, in addition to an in rem cause of action, the PSRPA provides for an action in personam. A judgment against an individual need not be related to any res and can look to all of a defendant's resources for satisfaction. To conclude the Limitation Act applies to the PSRPA would have the effect of rendering the in personam clause meaningless, as recovery would be limited to the value of the res. Such a result would violate the canon of statutory construction that discourages courts from adopting a reading of a statute that renders any part of the statute mere surplusage. See Bailey v. United States, 516 U.S. 137, 146 (1995) (noting that each word in a statute is intended to have "particular, nonsuperfluous meaning").

Thus, our reading of the Limitation Act and the PSRPA shows that the two present an irreconcilable conflict or a "positive repugnancy" as the statutes' provisions are inconsistent on their face, and a deeper reading of their terms shows that they are based on conflicting concepts of liability and different rules for the compensation of injury.

Tug-Allie seeks to avoid this result by arguing that the ambiguity created by the apparent applicability of both statutes to the situation before us requires that we look

to congressional intent. Specifically, Tug-Allie argues that the absence of reference to the Limitation Act in the PSRPA proves that Congress intended that the Limitation Act apply.[9] To support its view, Tug Allie directs our attention to the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq. ("OPA"), and the Marine Sanctuaries Act, 16 U.S.C. § 1431 et seq. ("MSA"), pointing out that both the OPA and the MSA contain specific provisions precluding the application of the Limitation Act to damage claims under those statutes. Thus, Tug Allie argues that if Congress intended to preclude the application of the Limitation Act, it would have said so as it did in the OPA[10] and the

_____

[9] Under the rules of statutory construction set out by the Supreme Court, in determining the meaning of an ambiguous statute, "we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." Crandon v. United States, 494 U.S. 152, 158 (1990); see also K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); United States v. McLemore, 28 F.3d 1160, 1162 (11th Cir. 1994) ("In interpreting the language of a statute . . . we do not look at one word or one provision in isolation, but rather look to the statutory scheme for clarification and contextual reference."). We thus carefully analyze both Acts to discern whether either Act contemplated the application of the other.

[10] In specifically precluding application of the Limitation Act, the OPA imposed its own liability scheme. See 33 U.S.C. §§ 2704 and 2718(c). Accordingly, the OPA explicitly limits liability of the responsible party under the Act, unless one of the enumerated exceptions applies (e.g., such as the incident was caused by gross negligence, willful misconduct, or violation of applicable Federal regulations, or failure to report the incident and provide cooperation in removal activities). 33 U.S.C. § 2704(c). The liability scheme set out in the OPA parallels that of the Limitation Act. That is, the OPA provides for limitation of liability, unless the responsible party was grossly negligent or engaged in willful misconduct, just as the Limitation Act limits liability unless the vessel owner had privity or knowledge of the negligence or unseaworthiness that caused the damage or loss. The liability provisions of the OPA suggest that Congress acted because it intended to limit liability in a manner that differed from the Limitation Act's scheme. From this, however, it does not follow that Congress must include provisions related to limitation of liability in a statute not intended to limit liability.

14

MSA.

Congressional silence, however, can be interpreted in a number of ways. As this Circuit has stated "[s]ilence may indicate that the question never occurred to Congress at all, or it may reflect mere oversight in failing to deal with a matter intended to be covered, or it may demonstrate deliberate obscurity to avoid controversy that might defeat the passage of legislation." Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 1085 (5th Cir. 1980).[11] Moreover, with respect to the Limitation Act itself, we have previously noted that the Supreme Court has taken a "restrictive view" of the Limitation Act, and courts have been reluctant to read into congressional silence an implied deference to the Limitation Act. See Hercules Carriers, Inc. v. Claimant State of Fla., Dept. of Transp., 768 F.2d 1558, 1564 (11th Cir. 1985) (citing Maryland Casualty Co., v. Cushing, 347 U.S. 409, 437 (1954); and The Main v. Williams, 152 U.S. 122, 132-33 (1894)).

Indeed, in an analogous case, this Court rejected Tug Allie's argument in the context of the Rivers and Harbors Act ("RHA"), 33 U.S.C. § 401 et seq. (sections collectively known as the "Wreck Act"). University of Texas Med. Branch at Galveston v. United States, 557 F.2d 438 (5th Cir. 1977), cert. denied 439 U.S. 820

---

[11] In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

(1978).  In University of Texas Medical Branch at Galveston, appellants' vessel collided with another ship causing a dredge to sink.  In addition to destroying the dredge, the wreck impeded shipping in the area.  The United States acted immediately to remove the wreck, at a cost of $3,000,000.  In turn, appellants sought a limitation of liability, based on the claimed value of their ship, $240,000.  The Wreck Act did not make any reference to the Limitation Act.  However, this Court declined to read Congress' silence as an intention to apply the Limitation Act.  Relying on Wyandotte Transportation Co. v. United States, 389 U.S. 191 (1967), this Court noted that, although the Wyandotte Court did not address the applicability of the Limitation Act, "Wyandotte has been interpreted as impliedly ousting the Limitation Act from application to the government's recovery of wreck removal expense."  University of Texas Med. Branch at Galveston, 557 F.2d at 447.[12]

Moreover, if Congress intended that its silence be read to mean that the Limitation Act applies, what then would be the significance of other enactments

---

[12]  Tug Allie relies on a recent Fifth Circuit case, Barnacle Marine Management, Inc., v. Vulcan Materials Co., 233 F.3d 865 (5th Cir. 2000), to suggest that Wyandotte is inapposite. They argue that the analogous section of the Wreck Act is Section 408, which was addressed in Barnacle. Even if we put aside the fact that this Court is bound by University of Texas Medical Branch at Galveston and Wyandotte, and not by Barnacle, we still conclude that Barnacle does not apply here.  In Barnacle, the Fifth Circuit found that "the plain language of § 408, § 411, and § 412 does not give the United States a civil in personam remedy against a violator of § 408" and thus the vessel owner was not precluded from seeking a limitation of liability.  Here, however, the plain language of the PSRPA explicitly creates an in personam remedy. Accordingly, we find the holding in Barncle to be irrelevant to determining whether the Limitation Act applies to claims brought under the PSRPA.

16

specifically providing that the Limitation Act does apply? Under Tug Allie's analysis, silence would then mean the converse of what Tug Allie suggests here. That is, because Congress included language providing for the application of the Limitation Act in the Carriage of Goods by Sea Act, 46 U.S.C. App. § 1300 et seq. ("COGSA"), and the Harter Act, 46 U.S.C. § 190 et seq., silence must mean that the Limitation Act should not apply. Both COGSA and the Harter Act expressly preserve a vessel owner's right to seek a limitation of liability under the Limitation Act. See COGSA, 46 U.S.C. App. § 1308 ("the provision of this chapter shall not affect the rights and obligations of the carrier . . . under the provisions of sections 175, 181 to 183 and 183b to 188 of this title"); Harter Act, 46 U.S.C. § 196 ("Sections 190-195 of this title shall not be held to modify or repeal sections, 181, 182, and 183 of this title"). We find that the only reasonable conclusion is that Congress' silence on the applicability of the Limitation Act is, by itself, not sufficient to determine congressional intent.

Turning to the purposes of the two enactments, we note that the Limitation Act was passed in 1851 "to encourage ship building and to induce capitalists to invest money in this branch of industry," and that it achieves this purpose by "exempting innocent shipowners from liability, beyond the amount of their interest." Norwich & N.Y. Transp. Co. v. Wright, 80 U.S. (13 Wall.) 104, 121 (1871). It was passed at a time when Congress sought to encourage the United States' fledgling shipping

17

industry. The PSRPA was enacted in 1990 to protect and preserve the resources of the United States' national parks. The PSRPA was prompted, in part, by the grounding of a freighter in Biscayne National Park. See Senate Comm. on Energy & Nat. Res., S. Rep. No. 328, 101st Cong., 2d Sess. 1, reprinted in 1990 U.S.C.C.A.N. 603, 605 (1990). Accordingly, as stated by Congress, a central purpose of the PSRPA was to authorize the United States to "initiate legal action against individuals who destroy or injure living or non-living marine or Great Lakes aquatic resources within units of the National Park System, and to allow the Secretary [of the Interior] to use funds recovered as a result of damage to living or non-living resources . . . for restoration of such resources." Id.

The purpose of the Limitation Act is to provide an exemption from or a limitation on liability in order to encourage shipping, while the PSRPA is aimed at full restoration of park resources that have been damaged by third parties. As noted above, under the Limitation Act, in many instances, destroyed resources could not be fully restored. Thus, application of the Limitation Act would obviously frustrate the restoration goals articulated in the PSRPA.

The Ninth Circuit reached a similar conclusion in addressing the applicability of the Limitation Act to the analogous Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. §§ 1651-55 ("TAPAA"). See In re Glacier Bay, 944 F.2d 577 (9th

18

Cir. 1991). TAPAA's purpose, in part, was to establish a comprehensive liability scheme applicable to damages to natural resources resulting from the transportation of trans-Alaska pipeline oil. The Ninth Circuit held: "[s]imply stated, the Limitation Act is contrary to every goal of the TAPAA. It allows vessel owners virtually to eliminate liability for catastrophic damages. Application of the Limitation Act to any aspect of the TAPAA would frustrate completely TAPAA's comprehensive remedial nature." Id. at 583. Likewise, in rejecting a claim that the procedural aspects of the Limitation Act apply to the OPA, the First Circuit found that the OPA is in irreconcilable conflict with the Limitation Act, as application of the Limitation Act to the OPA would enable a responsible party to escape liability for catastrophic damages. See Complaint of Metlife Capital Corp., 132 F.3d 818, 822 (1st Cir. 1997); see also United States v. CF Industries, Inc., 542 F. Supp. 952, 955-56 (D. Minn. 1982) (holding that the Limitation Act did not apply to the Clean Water Act and explaining that "[t]his country's policy of cleaning up and preserving the environment is one that becomes, if anything, more important with the passage of time. As the population of the country increases, the natural resources are subjected to greater pressures and accordingly need greater safeguards. On the other hand, the policy embodied in the Limitation Act has been achieved to such an extent that it has been called 'hopelessly anachronistic.'") (citations omitted).

Moreover, unlike the OPA and the MSA, which are primarily maritime statutes, the PSRPA protects park system resources whether on land or in maritime parks. To apply the Limitation Act to the PSRPA would require assuming that Congress intended to create a statutory scheme that ensured full protection for park resources on land but only partial protection of our marine park resources. Nothing in the statute or the legislative history supports such a view, nor do we think that Congress would have intended such a dichotomous result. See, e.g., United States v. Albertini, 472 U.S. 675, 680 (1985) ("[O]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language.") (citations and internal quotations omitted); First United Methodist Church v. United States Gypsum Co., 882 F.2d 862, 869 (4th Cir.1989) (stating that common sense is the "most fundamental guide to statutory construction"), cert. denied, 493 U.S. 1070 (1990). See also Justice Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 535 (1947) (stating that "[j]udges must not read [meaning] out [of a statute] except to avoid patent nonsense or internal contradiction"). The only conclusion that avoids such an illogical reading of the PSRPA is that Congress intended to protect parks resources to the same extent, whether such resources are on land or at sea.

Viewing both the statutory language of the PSRPA and its broader remedial aim

of protecting and preserving our nation's natural resources, we find nothing that suggests that Congress intended the PSRPA's statutory scheme to provide for only limited recovery, thereby burdening the government, and ultimately the taxpayer, with the costs associated with destruction, loss, or injury to park resources that are in fact attributable to an identifiable person or instrumentality.[13] On the contrary, the PSRPA is aimed at ensuring that the person or instrumentality responsible for any destruction, loss, or injury covers all of the costs associated with such destruction, loss, or injury, and applying the Limitation Act to PSRPA claims would completely frustrate this purpose.

All the foregoing reasons dictate that the PSRPA and the Limitation Act are conflicting congressional expressions that cannot be harmonized without affecting the intent and directives of one or the other. Having concluded that the two statutes pose an irreconcilable conflict in this case, we must consider whether one of the statutes

---

[13] We find no merit to Tug Allie's argument that the PSRPA's purpose has nothing to do with the amount of funds available as damages or a party's liability, but was intended merely as a means of ensuring that funds would be available to the Secretary of the Interior to repair or replace the damaged or lost resources "without further congressional action," see 16 U.S.C. 19jj-3, rather than having to wait for congressional authorization from general Treasury funds. If the PSRPA was intended to provide funds to the Secretary of Interior in an expeditious manner in order to avoid further injury to park resources, it seems implausible that Congress envisioned making only a pro rata share of such necessary funds available. It is far more likely that Congress aimed to provide a means by which the Secretary of the Interior could recover the full amount needed for response costs and damages. The absence of any provision on prioritization of funds from the language of the PSRPA further suggests that Congress envisioned full recovery.

implicitly overrules the other or creates an exception which limits one statute's application in this class of cases.

In making this determination, we rely on the long-standing principle that, if two statutes conflict, the more recent or more specific statute controls. See, e.g., Southern Natural Gas Co., 197 F.3d at 1373 ("more recent or specific statutes should prevail over older or more general ones") (quotation and citation omitted); United States v. Devall, 704 F.2d 1513, 1518 (11th Cir. 1983) (because the conflict between the Bankruptcy Code and the Social Security Act is apparent and cannot be reconciled without limiting one to accommodate the other, the later enacted statute must prevail over the earlier enacted, more general statute); Hines v. United States, 551 F.2d 717, 725 (6th Cir. 1977) (when the purposes of two statutes appear to be in conflict with each other, and there is no statutory language which makes any cross reference and the legislative history is silent as to the possible conflict, it is generally assumed that the later statute constitutes an amendment of the earlier one); I.C.C. v. Southern Ry. Co., 543 F.2d 534, 539 (5th Cir. 1976) (where there is conflict, the subsequent enactment governs).

Obviously, the PSRPA is the most recent in time, enacted almost 140 years after the Limitation Act. Thus, on this basis alone, we can conclude that the PSRPA

controls.[14]   We also conclude that the PSRPA is the more specific statute. The

PSRPA's provisions are narrowly tailored to address incidents involving destruction,

loss, or injury only to "park system resources" (a term defined by the PSRPA), and

allows the government to recover only for response costs and damages associated with

such incidents.  In contrast, the Limitation Act applies to "embezzlement, loss, or

destruction by any person of any property, goods, or merchandise shipped or put on

board of such vessel, or . . . any loss, damage, or injury by collision, or . . . any act,

matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred." 46 U.S.C.

§ 183(a).  Although the Limitation Act's reference to "any loss, damage, or injury by

collision" may be read to include loss or damage to park system resources, when a

conflicting statute – the PSRPA – specifically defines, and is tailored to address, "park

system resources," we must find that the more specific statute governs.

For all of the foregoing reasons, the decision of the district court holding that

the Limitation Act does not apply to claims under the PSRPA is

**AFFIRMED**.

BLACK, Circuit Judge, specially concurring:

---

[14] Tug Allie is correct that the Limitation Act has not been repealed or overruled, but we note that it has been called into question during the past century and a half of litigation. See, e.g., Hercules Carriers, 768 F.2d at 1564 (noting that the Supreme Court has taken a "restrictive view" of the Limitation Act); University of Texas Med. Branch at Galveston, 557 F.2d at 441 (referring the Limitation Act as "hopelessly anachronistic").

23

I write separately because I think this is a much closer case than does the majority. In fact, my initial view was to dissent. It was only after going through the following process that I came to the same conclusion.

The Supreme Court has demanded courts meet a high standard before taking the drastic recourse of implicitly repealing one statute in the face of another. In light of this standard, my first course of action is to vigorously attempt to construe harmoniously the Limitation of Vessel Owner's Liability Act, 46 U.S.C. app. §§ 181-189 (Limitation Act), and the Park System Resource Protection Act, 16 U.S.C. §§ 19jj-19jj-4 (PSRPA). I cannot ignore, however, that the PSRPA is strict liability statute, while the Limitation Act incorporates a negligence standard, and that the PSRPA allows for unlimited *in personam* liability, while the Limitation Act would effectively restrict liability to the extent allowed in an *in rem* action. I ultimately conclude these structural differences are so integral to the two statutes as to render them irreconcilably in conflict.

I rely, however, on narrower grounds than does the majority. I do not look to the apparent purposes of the two statutes, their legislative histories, or their underlying policies. I also do not consider that courts have apparently taken a restrictive view of the Limitation Act or that Congress recently amended the Limitation Act.

Following on the irreconcilable conflict between the two statutes, I conclude

the Limitation Act should be implicitly repealed to the extent it interacts with the PSRPA solely because the PSRPA was enacted more recently than the Limitation Act. I think it is unnecessary to invoke the canon that a specific statute can repeal a more general statute, and, in any case, I think both statutes are general.

Finally, my hesitancy in reaching the conclusion of implicit repeal in this case is due, in large part, to the fundamental principles of judicial restraint. After much deliberation, however, I conclude this is the rare case where the statutes are so irreconcilably in conflict that we are left with no choice but to hold the later one implicitly repeals the earlier one.

I.

I agree with the majority that we must follow here the "principle that statutes relating to the same subject matter should be construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones." *S. Natural Gas Co. v. Land, Cullman County,* 197 F.3d 1368, 1373 (11th Cir. 1999). This statement, however, is based on precedent from the Supreme Court and this Court which demands that a high standard be met prior to undertaking the drastic step of implicitly repealing one statute in light of another. *See Amell v. United States,* 384 U.S. 158, 165-66, 86 S. Ct. 1384, 1388 (1966) (explaining that a party requesting the implicit repeal of one statutory provision in

the face of a later-enacted provision "bears a heavy burden of persuasion"). The Supreme Court has articulated this high standard as follows: "'[T]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 618-19, 100 S. Ct. 1905, 1911 (1980) (quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S. Ct. 2474, 2483 (1974)); *see also Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018-19, 104 S. Ct. 2862, 2881 (1984) (quoting the above language and explaining that congressional silence in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) concerning the remedy under the Tucker Act "cannot be construed to reflect an unambiguous intention to withdraw the Tucker Act remedy"); *Reg'l Rail Reorganization Act Cases,* 419 U.S. 102, 133-34, 95 S. Ct. 335, 353-54 (1974) (quoting *Morton v. Mancari* and explaining that the remedy under the Tucker Act should not be read to withdraw the Regional Rail Reorganization Act of 1973); *Pan. R.R. Co. v. Vasquez,* 271 U.S. 557, 561-62, 46 S. Ct. 596, 597 (1926) (requiring "certainty" in statutory language in order to depart from "long-prevailing policy evidenced by" other statutes); *In re E. River Towing Co.,* 266 U.S. 355, 367, 45 S. Ct. 114, 115 (1924) ("an intention to depart from a policy deliberately settled in a general

26

statute is not lightly to be assumed").  The Supreme Court has long adhered to the

principle that repeals by implication are not favored.  *See, e.g., Watt v. Alaska,* 451

U.S. 259, 266-67, 101 S. Ct. 1673, 1678 (1981); *Universal Interpretive Shuttle*

*Corp. v. Wash. Metro. Area Transit Comm'n,* 393 U.S. 186, 193, 89 S. Ct. 354,

359 (1968); *Silver v. N.Y. Stock Exch.,* 373 U.S. 341, 357, 83 S. Ct. 1246, 1257

(1963) ("the proper approach to this case, in our view, is an analysis which

reconciles the operation of both statutory schemes with one another rather than

holding one completely ousted");  *FTC v. A.P.W. Paper Co.,* 328 U.S. 193, 202, 66

S. Ct. 932, 936 (1946)); *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S. Ct.

182, 188 (1939) ("When there are two acts upon the same subject, the rule is to

give effect to both if possible."); *Ex Parte Yerger,* 75 U.S. (8 Wall.) 85, 105 (1868)

(habeas corpus context).

Early on, the Supreme Court articulated the high standard that must be met

as follows:  "[Repeals by implication] are seldom admitted except on the ground of

repugnancy; and never, we think, when the former act can stand together with the

new act." *Ex Parte Yerger,* 75 U.S. (8 Wall.) at 105.  More than 100 years later,

the Supreme Court reiterated this high standard, approvingly quoting the following

language:  "'A new statute will not be read as wholly or even partially amending a

prior one unless there exists a 'positive repugnancy' between the provisions of the

27

new and those of the old that cannot be reconciled.'" *Reg'l Rail Reorganization Act Cases,* 419 U.S. at 134, 95 S. Ct. at 354 (quoting *In re Penn Cent. Transp. Co.*, 384 F. Supp. 895, 943 (Sp. Ct. R.R.R.A. 1974)); *see also Mercantile Nat'l Bank v. Langdeau,* 371 U.S. 555, 565, 83 S. Ct. 520, 526 (1963) (requiring "some manifest inconsistency or positive repugnance between the two statutes" to effect an implicit repeal); *Borden Co.,* 308 U.S. at 198-99, 60 S. Ct. at 188 (quoting *Wood v. United States,* 41 U.S. (16 Pet.) 342, 363 (1842) (demanding a "positive repugnancy" between two statutory provisions for one to implicitly repeal the other)); *Posadas v. Nat'l City Bank,* 296 U.S. 497, 504, 56 S. Ct. 349, 352 (1936) (quoting *Town of Red Rock v. Henry,* 106 U.S. (16 Otto) 596, 601, 1 S. Ct. 434, 439 (1883) (requiring for an implicit repeal either "irreconcilable conflict" between two statutes or complete substitution of one by the other)).

The Supreme Court has worked arduously to construe statutes in harmony with each other. *See, e.g., Ruckelshaus,* 467 U.S. at 1018-19, 104 S. Ct. at 2880-81 (construing FIFRA provision under which failure to submit to arbitration proceeding results in forfeiture of right to compensation as exhaustion prerequisite to Tucker Act remedy, rather than as substitute for Tucker Act remedy); *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 156-57, 96 S. Ct. 1989, 1994 (1976) (holding statute that allows for venue broadly and statute that restricts

28

venue are not irreconcilably in conflict, since applying narrow venue provision in case would not affect the vast majority of actions, and suits could still be filed under the former statute); *Pan. R.R. Co.*, 271 U.S. at 561-62, 46 S. Ct. at 597 (construing Jones Act provision regarding jurisdiction in district courts to relate only to venue so as not to conflict with other statutes which permit suit both in district court and state court); *see also In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 974 F.2d 775, 787 (7th Cir. 1992) (reconciling policies of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and the Bankruptcy Act of 1898 rather than concluding the Bankruptcy Act bars CERCLA claims). By contrast, this Court has held a rule of civil procedure to implicitly repeal a statutory provision based on the determination that the two conflict to the point they simply cannot co-exist. *See S. Natural Gas Co.,* 197 F.3d at 1375 (holding that where a rule granted district courts discretion to appoint a commission to hear a case, and a separate statute allowed for a jury trial in accordance with state practice and procedure, the former superseded the latter).

II.

In accordance with the dictates of the Supreme Court, *see supra* Part I, my first course of action in analyzing the Limitation Act and the PSRPA is to

assiduously attempt to harmonize these two statutes if at all possible.[1]  I therefore

focus on what I consider to be the most compelling arguments to allow for the

harmonization of the Limitation Act and the PSRPA.

First, it is arguable that the Limitation Act and the PSRPA do not

irreconcilably conflict since the Limitation Act limits recovery to a relatively

narrow subset of claims arising under the PSRPA — only to those claims involving

a vessel.  The PSRPA provides:  "[A]ny person who destroys, causes the loss of, or

injures any park system resource is liable to the United States . . . ."  16 U.S.C.

§ 19jj-1(a).  A "park system resource" is, in turn, defined broadly as "any living or

non-living resource that is located within the boundaries of a unit of the National

Park System, except for resources owned by a non-Federal entity."  16 U.S.C.

§ 19jj(d).  "Park system resource," therefore, encompasses both terrestrial and

marine resources.  While PSRPA claims can be based on destruction or injury to

both terrestrial and marine resources, the Limitation Act applies, by definition,

only to the small fraction of claims involving marine resources.[2]  Perhaps on this

_____

[1] By contrast, the majority seems to begin with the premise that neither harmonization nor implicit repeal is a more favorable option than the other.  *See* Opinion at 7 ("[W]e begin by reviewing the language of both the PSRPA and the Limitation Act . . . to determine whether the two Acts can be read harmoniously or if when read together they present 'a positive repugnancy' or conflict that cannot be reconciled.").

[2] The majority acknowledges the PSRPA covers both terrestrial and marine resources.  *See* Opinion at 20.  Based on this observation, however, the majority argues the implicit repeal of the Limitation Act is supported by the need to avoid potentially disparate awards under the PSRPA

basis, therefore, the two statutes are not "positively repugnant" and can co-exist in the vast majority of situations.

Even in situations involving marine resources, it is arguable the Limitation Act does not completely obliterate the PSRPA's recovery scheme. Specifically, the Limitation Act allows for some measure of recovery to the United States for damages to park system resources under the PSRPA, and there is no reason to think the PSRPA guarantees complete recovery to the United States. Under the Limitation Act, a vessel owner's maximum liability, and thus an injured party's recovery, are highly variable, as these amounts depend on the value of the vessel and its freight. *See* 46 U.S.C. app. § 183(a). While the vessel and its freight could be destroyed in the course of a loss incident, there is no reason to assume this worst case scenario would be the norm. The Supreme Court has pointed out "[t]he [Limitation] Act is not one of immunity from liability but of limitation of it." *Lake Tankers Corp. v. Henn,* 354 U.S. 147, 152, 77 S. Ct. 1269, 1272 (1957).

Turning to the PSRPA, while the majority is correct that there is nothing in the statute suggesting any limitation of liability, *see* Opinion at 7, there is also nothing in the statute to suggest the United States is entitled to complete recovery.

---

for terrestrial and marine resources. *See id.* at 20-21. I respectfully suggest that it is not the role of this Court to determine Congress' intentions. *See infra* Part V. Had Congress wanted to avoid this potential result, it could have addressed the Limitation Act in the PSRPA.

While "damages" and "response costs" are defined broadly in the PSRPA, *see* 16 U.S.C. §§ 19jj(b), (c), the statute merely states that the Attorney General "may commence a civil action . . . for response costs and damages[,]" *id.* § 19jj-2(a). The PSRPA makes no suggestion of and evinces no expectation of full recovery. As I do not believe broadly defined damages and response costs translate to full recovery of these sums, I respectfully disagree with the majority's inference that the PSRPA contemplates full recovery. *See* Opinion at 8.

Furthermore, there are any number of defenses that could be asserted against a PSRPA claim which would limit the United States' recovery. For example, in holding the Limitation Act applies to claims under the Jones Act, the Supreme Court explained, "The bankruptcy act might provide a bar to recovery — homestead and other exemptions might make collection of a judgment impossible — yet we do not suppose that it would be argued that such laws were overridden by section 33 [of the Jones Act]." *In re E. River Towing Co.,* 266 U.S. 355, 368, 45 S. Ct. 114, 115 (1924). The Court observed that although the Jones Act does not explicitly restrict the applicability of the Limitation Act, "there can be no doubt that [the Limitation Act] would apply unless repealed." *Id.* at 367, 45 S. Ct. at 115. In fact, the Court drew this conclusion even while noting the Limitation Act is not mentioned in the Jones Act's list of statutory provisions to be repealed. *See id.*

32

The Court therefore strongly implied the Limitation Act can apply to limit liability under a statute despite the Act's absence from the governing statute's list of repealed provisions. It follows that the Limitation Act can apply despite its absence from the PSRPA's list of defenses. *See* 16 U.S.C. § 19jj-1(c). I therefore respectfully disagree with the majority's suggestion that the PSRPA's defenses are exclusive.[3] *See* Opinion at 11-12.

In sum, the recovery permitted under the Limitation Act is highly variable, the recovery under the PSRPA need not be complete, and the PSRPA's enumerated defenses are not exclusive. That the Limitation Act, therefore, does not completely eviscerate recovery under the PSRPA could, arguably, support the harmonization of the Limitation Act and the PSRPA.

The goal of harmonization may draw support not only from the structure and

---

[3] In support of this suggestion of exclusivity, the majority cites PSRPA's legislative history, as well as *Andrus v. Glover Construction Co.,* 446 U.S. 608, 616-17, 100 S. Ct. 1905, 1910 (1980), for the proposition that additional exceptions should not be inferred in the face of enumerated exceptions to a general prohibition. First, I would not rely on legislative history in the absence of a textual basis. *See infra* Part V. Second, I believe *Andrus* is distinguishable. In *Andrus*, a statute listed 15 exceptions to a general rule, the fifteenth of which applied to the given situation. Elsewhere, the statute prohibited the specific contract at issue unless it was authorized by one of a subset of the 15 exceptions. The fifteenth exception was not included in this subset. *Andrus,* 446 U.S. at 615-16, 100 S. Ct. at 1909-10. The Court therefore held that the fifteenth exception could not be implied with respect to the contract, as the exception was explicitly mentioned in one place and omitted in another. *Id.* This situation is distinguishable from the case at issue, since the three defenses permitted under the PSRPA, *see* 16 U.S.C. § 19jj-1(c), are not a subset of defenses mentioned elsewhere in the statute. I therefore believe *Andrus* does not provide a basis for precluding a Limitation Act defense.

33

language of the statutes themselves, but also from congressional activity with respect to another statute, the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. §§ 1431-1445c-1 (MPRSA). The MPRSA was amended in 1988 to establish liability for any person or vessel that destroys, causes the loss of, or injures any sanctuary resource. *See* Act of Nov. 7, 1988, Pub. L. No. 100-627, § 312, 102 Stat. 3215 (codified as amended at 16 U.S.C. §§ 1443(a)). Prior to 1992, the MPRSA was silent on the issue of whether the Limitation Act would apply. In 1992, however, Congress amended the MPRSA to preclude application of the Limitation Act. *See* Oceans Act of 1992, Pub. L. No. 102-587, § 2110(c), 106 Stat. 5039 (codified as amended at 16 U.S.C. § 1443(a)(4)). An inference can be drawn from this amendment that silence with regard to the Limitation Act is construed by Congress as permitting the unimpeded applicability of the Act. Otherwise, Congress would have had no need to amend the MPRSA to explicitly preclude the Limitation Act's applicability.

III.

Despite a concerted effort to harmonize the Limitation Act and the PSRPA, I cannot ignore two extremely compelling arguments undermining this attempted harmonization.

First, I agree with the majority that the PSRPA is a strict liability statute.

34

*See* Opinion at 9-10 & n.5. In drawing this conclusion, I would, like the majority, rely on the narrow defenses enumerated in the text of the PSRPA, *see* 16 U.S.C. § 19jj-1(c), and on the comparison between the PSRPA's defenses and the substantially similar ones in the MPRSA, a statute which imposes strict liability, *see* 16 U.S.C. § 1443(a)(3). *See also United States v. M/V Jacquelyn L.,* 100 F.3d 1520, 1521 (11th Cir. 1996). In fact, I note the defenses in the PSRPA are even slightly more narrow than those in the MPRSA, as the latter includes a defense for negligible destruction, whereas the former does not. *Compare* 16 U.S.C. § 1443(a)(3)(C), *with* 16 U.S.C. § 19jj-1(c). I would not, however, rely on the legislative history cited by the majority. *See* Opinion at 11; *see infra* Part V.

By contrast, the Limitation Act incorporates a negligence standard. The Act limits the liability of vessel owners for destruction occasioned "without the privity or knowledge of such owner[s] . . . ." 46 U.S.C. app. § 183(a). The Supreme Court has explained that "mere negligence, pure and simple, in and of itself does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the statute." *Deslions v. La Compagnie Generale Transatlantique,* 210 U.S. 95, 122, 28 S. Ct. 664, 673 (1908). The Former Fifth Circuit has elaborated that the Limitation Act "relieve[s] the owner of personal liability, where he has not been personally negligent or privy to

35

the negligence of his servants or agents, where in short the negligence or fault which causes the injury is attributable to him , not personally, but only under the doctrine of *respondeat superior*." *Cont'l Ins. Co. v. Sabine Towing Co.,* 117 F.2d 694, 698 (5th Cir. 1941);[4] *see also Craig v. Cont'l Ins. Co.,* 141 U.S. 638, 646, 12 S. Ct. 97, 99 (1891) (explaining the Limitation Act meant to exempt vessel owners from liability due to neglect of their agents or of third parties without the owners' knowledge or concurrence, but not to diminish the owners' responsibility for their own willful or negligent acts). In this case, while the PSRPA would hold vessel owners liable for the destruction of marine resources regardless of fault (with a few minor exceptions), the Limitation Act would limit this broad liability if the owners are negligent under *respondeat superior*, without more. The Limitation Act in this case would allow for unimpeded PSRPA liability only in the narrow circumstance that these owners have acted in privity or with knowledge.[5] Applied in concert with the PSRPA, the Limitation Act would, therefore, eviscerate the strict liability standard at the core of the PSRPA.

---

[4] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[5] I note that corporate owners, like individual owners, are subject to the privity or knowledge standard. *See, e.g., Craig v. Cont'l Ins. Co.,* 141 U.S. 638, 646, 12 S. Ct. 97, 99 (1891) ("When the owner is a corporation, the privity or knowledge must be that of the managing officers of the corporation."); *see generally* 3 David E.R. Woolley, Benedict on Admiralty § 42 (7th ed. 1998).

Second, the Limitation Act would limit the *in personam* remedy provided in the PSRPA to such an extent that it would have the effect of an *in rem* remedy. The PSRPA provides for both *in personam* and *in rem* liability. *See* 16 U.S.C. §§ 19jj-1. The Limitation Act limits the liability of a vessel owner to the value of the vessel and its pending freight. *See* 46 U.S.C. app. § 183(a). While the effect of the Limitation Act on an *in rem* remedy is not completely clear,[6] it is clear that the Limitation Act would reduce *in personam* liability from, potentially, the full extent of an owner's personal assets to merely the value of the vessel and its freight. *In personam* liability under the Limitation Act would thus be effectively limited to the extent of *in rem* liability generally.[7] *See, e.g., Shaffer v. Heitner,* 433 U.S. 186,

---

[6] The Supreme Court has stated that in a Limitation Act proceeding, "the court may enter judgment *in personam* against the owner as well as judgment *in rem* against the *res* . . . ." *Hartford Accident & Indem. Co. of Hartford v. S. Pac. Co.,* 273 U.S. 207, 215, 47 S. Ct. 357, 359 (1927). Earlier, however, the Court explained that "[t]he proceeding to limit liability is not an action against the vessel and her freight, except when they are surrendered to a trustee . . . ." *Morrison v. Dist. Court of United States for S. Dist. of N.Y.,* 147 U.S. 14, 34, 13 S. Ct. 246, 253 (1893). I have difficulty understanding how the Limitation Act could apply to an *in rem* proceeding, as the statute explicitly applies solely to "the *owner* of any vessel." 46 U.S.C. app. § 183 (emphasis added). In any case, since recovery in an *in rem* action is limited, by definition, to the value of the *res,* the Act's limitation of liability to the value of the vessel and its freight would seem to have no practical effect in the context of an *in rem* suit.

[7] I do not reach the conclusion drawn by the majority that the Limitation Act renders the PSRPA's *in personam* liability provision "mere surplusage." *See* Opinion at 13. I view *in personam* and *in rem* liabilities as distinct. *See* 29 James W. Moore, Moore's Federal Practice § 707.04[1][b][i] (3d ed. 2000) ("Of course, if the jurisdictional requirements for both *in rem* and *in personam* jurisdiction can be met, there is nothing to preclude a suit from being brought both *in rem* and *in personam*."); 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1070 (2d ed. 1987) ("[I]t is still important to distinguish actions based on property from those based on personal jurisdiction because of their different consequences."). I think that

37

207 n.23, 97 S. Ct. 2569, 2581 n.23 (1977) (noting that liability in an *in rem* action is limited to the value of the property). By basing liability on the value of the vessel and its freight, *i.e.,* on the *res,* rather than on the value of the full range of an owner's personal assets, the Limitation Act would severely undercut the PSRPA's extensive *in personam* liability and replace it with a more limited liability. Furthermore, the Limitation Act would impose liability resembling *in rem* liability, thereby substantially changing the character of the PSRPA's *in personam* liability.

IV.

After much deliberation, I conclude the differences between the Limitation Act and the PSRPA regarding negligence versus strict liability and limited versus unlimited *in personam* liability go to the heart of the two statutory schemes. In my opinion, these differences in liability standards are repugnant to each other and evince irreconcilable conflicts between the two statutes. This is most clearly shown by the example of a vessel owner whose employees negligently cause damage to marine resources, but absent the owner's privity or knowledge. Under

---

even when the Limitation Act applies, both *in personam* and *in rem* remedies under the PSRPA are preserved. The Limitation Act merely reduces the *in personam* liability such that the maximum recovery in both *in personam* and *in rem* suits is limited to the value of the vessel and its freight. Since both types of suit would still be available under the Limitation Act, I would not go so far as to say that *in personam* liability would be "meaningless" or "surplusage." *See* Opinion at 13. Rather, my point is that the Limitation Act substantially reduces *in personam* recovery and transforms its essential character.

the PSRPA and without the application of the Limitation Act, this owner would be held liable under the PSRPA's strict liability standard to the extent that his or her personal assets would permit, without regard to the value of the vessel. By contrast, under the Limitation Act, this same owner — who could ordinarily be held negligent under *respondeat superior* — would be liable only in the amount of the vessel and its pending freight.

It is true that many situations may arise where the Limitation Act may not substantially affect the recovery under the PSRPA. For example, where terrestrial resources are involved, the Limitation Act would not apply to limit recovery under the PSRPA. Additionally, where a vessel remains intact, recovery based on the value of the vessel may approach the potential *in personam* recovery against the vessel owner. *See supra* Part II. In this case, however, vessels and marine resources are at issue, and the alleged post-accident value of the vessel and its pending freight is approximately $2.8 million less than the damages sought by the United States and Allied Towing Corporation. *See* Opinion at 4. It misses the point to venture outside the bounds of this case and to speculate about situations involving terrestrial resources or minimal vessel damage. Here, both the PSRPA and the Limitation Act are, by their terms, potentially applicable, and they have substantially different consequences.

The argument that the two statutes will not always conflict to a significant extent is not only speculative, but also relates only to the practical outcome of the interplay between the PSRPA and the Limitation Act. That is, circumstances can be devised such that the Limitation Act will not substantially reduce PSRPA recovery. By contrast, the divide between negligence and strict liability and between limited and unlimited *in personam* liability will arise in every situation where a vessel injures marine resources, and these differences go to the theoretical foundations underpinning the PSRPA and the Limitation Act. Since they are integral and essential to the two statutory regimes, these differences in liability are sufficient to render the PSRPA and the Limitation Act repugnant to each other and irreconcilably in conflict.

Finally, an examination of maritime statutes with Limitation Act references detracts from the argument that the MPRSA amendment precluding the Limitation Act is evidence that silence permits the application of the Act. Of the various maritime statutes mentioned in the parties' briefs, the Carriage of Goods By Sea Act, 46 U.S.C. app. §§ 1300-1315 (COGSA), and the Harter Act, 46 U.S.C. app. §§ 190-196, explicitly allow for the application of the Limitation Act. *See* 46

U.S.C. app. § 1308 (COGSA); 46 U.S.C. app. § 192 (Harter Act).[8]  By contrast, the

Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950

(LHWCA), the Oil Pollution Act, 33 U.S.C. §§ 2701-2761 (OPA), and the

MPRSA, *see supra* Part II, explicitly preclude the application of the Limitation

Act.  *See* 33 U.S.C. § 948 (LHWCA);[9] 33 U.S.C. § 2718(c) (OPA); 16 U.S.C.

§ 1443(a)(4) (MPRSA).[10]  As an initial matter, I therefore agree with the majority

that the PSRPA's silence with respect to the Limitation Act, without more, cannot

yield a conclusion about the Act's applicability.  This determination does not affect

the negative inference to be drawn from the MPRSA amendment.

There is, however, a pattern that statutes explicitly allowing for the

application of the Limitation Act incorporate a negligence standard, while those

explicitly precluding the application of the Limitation Act utilize a strict liability

---

[8] The Jones Act, 46 U.S.C. app. § 688, and the Death on the High Seas Act, 46 U.S.C. app. §§ 761-767 (DOHSA), are silent as to the application of the Limitation Act.  These statutes, therefore, will not be considered here.  Courts, however, have held that these Acts allow for the application of the Limitation Act.  *See, e.g., Pettus v. Jones & Laughlin Steel Corp.,* 322 F.Supp. 1078 (W.D. Pa. 1971) (permitting assertion of Limitation Act defense to Jones Act claim); *The Four Sisters,* 75 F. Supp. 399 (D. Mass. 1947) (allowing for the possibility that Limitation Act applies to DOHSA claim).

[9] At least one court has inexplicably addressed the merits of a Limitation Act defense against a LHWCA claim, rather than citing the LHWCA's language precluding the Limitation Act's applicability.  *See Bates v. Merritt Seafood, Inc.,* 663 F. Supp. 915 (D.S.C. 1987).

[10] I will not here address the alternate, statute-specific liability schemes set forth in the OPA, *see* 33 U.S.C. § 2704, and the COGSA, *see* 46 U.S.C. app. § 1304(5).

standard. *Compare* 46 U.S.C. app. § 1304(1)-(3) (COGSA) (no liability for carriers and ships so long as due diligence was used and absent actual fault, privity, or neglect), *and* 46 U.S.C. app. § 192 (Harter Act) (no liability for vessel and for its owners, agents, and charterers so long as owners exercise due diligence), *with* 33 U.S.C. § 905(a) (LHWCA) (in the absence of securing payment of compensation as otherwise required, a maritime employer is liable to deceased or disabled employees and may not invoke the defenses of fellow servant negligence, assumption of the risk, or contributory negligence),[11] 33 U.S.C. § 2703(a) (OPA) (the only permitted complete defenses are act of God, act of war, and act or omission of a third party), *and* 16 U.S.C. § 1443(a)(3) (MPRSA) (the only permitted defenses are act of God, act of war, act or omission by a third party, injury caused by legally authorized activity, and negligible injury). This dichotomous pattern cuts against the conclusion that the pre-amendment silence in the MPRSA means the Limitation Act should apply. *See supra* Part II. When the MPRSA was amended in 1992, the dichotomous pattern was established, as the COGSA, the Harter Act, the LHWCA, and the OPA — with their Limitation Act references — were all in effect in 1992. It therefore seems reasonable to suppose

---

[11] LHWCA permits suits against vessels (*i.e., in rem* actions) under a negligence standard. *See* 33 U.S.C. § 905(b). This provision is not relevant here since the Limitation Act appears to apply only to *in personam* actions. *See supra* note 6.

that in amending the MPRSA, a strict liability statute, to preclude the application

of the Limitation Act, Congress may have simply been explicitly bringing the

MPRSA in line with its statutory counterparts.  The negative inference drawn from

the MPRSA loses some of its luster in the face of this possibility.  I therefore

conclude the MPRSA's pre-amendment silence is indeterminative.

V.

In reaching the conclusion that the Limitation Act and the PSRPA are in

conflict, I rely exclusively on the irreconcilable conceptions of liability in the

PSRPA and the Limitation Act.  *See supra* Parts III & IV.  There are other bases

invoked by the majority on which I do not rely.  Although I ultimately reach the

same conclusion as the majority, my reasoning is more narrow.

First, I would not rely on the apparent purposes of the Limitation Act and the

PSRPA, respectively, as understood by the majority.[12]  *See* Opinion at 17-21.  I

similarly would not rely on the statutes' legislative histories,[13] or the policies

---

[12] For example, from legislative history that explains the PSRPA was enacted to allow for legal action that would result in funds for resource recovery, the majority infers "the PSRPA is aimed at *full* restoration of park resources . . . ."  Opinion at 18 (emphasis added).  Similarly, the majority concludes "the PSRPA is aimed at ensuring that the person or instrumentality responsible for any destruction, loss, or injury covers *all* of the costs associated with such destruction, loss, or injury . . . ."  *Id.* at 21 (emphasis added).  As discussed above, *see supra* Part II, I do not believe the PSRPA exhibits an expectation of full recovery.  In any case, I have difficulty seeing how the inference of full recovery follows from the cited legislative history.

[13] Based on these principles, I would not, like the majority, approvingly discuss the Ninth Circuit's invocation of legislative purpose in holding the Limitation Act implicitly repealed in

underlying the statutes.[14]   Rather, statutory structure is a sufficient basis from which to draw a conclusion in this case.

Also, I would not consider the fact that courts have apparently taken a restrictive view of the Limitation Act.  *See* Opinion at 15.  Implicitly repealing an otherwise valid statute is a much harsher outcome than merely construing a statute narrowly.  The apparently strict construction of the Limitation Act should therefore not influence whether the Act should be implicitly repealed.  I would examine only whether the Limitation Act and the PSRPA are irreconcilably in conflict, not which statute has been judicially favored.[15]  By the same token, I also would not consider

the face of the Trans-Alaska Pipeline Authorization Act, 43 U.S.C. §§ 1651-56 (TAPAA).  *See In re the Glacier Bay,* 944 F.2d 577 (9th Cir. 1991).  The Ninth Circuit determined that Congress' purpose in enacting the TAPAA was to establish a comprehensive liability scheme for oil spills, and that "Congress, in enacting TAPAA, was clearly concerned about the ability of existing laws to compensate innocent victims of a disastrous trans-Alaska oil spill." *Id.* at 583.  On this basis in part, the Ninth Circuit concluded "[t]he Limitation Act is contrary to every aspect of TAPAA." *Id.*  I respectfully disagree with this approach.

[14] For example, the majority mentions that limiting the liability of the owners of vessels causing damage to natural resources would ultimately burden the taxpayer. *See* Opinion at 21.

[15] In any case, the cases cited by the majority for the proposition that the Limitation Act has been viewed restrictively do not conclusively establish this proposition.  First, any criticism of the Limitation Act from *Maryland Cas. Co. v. Cushing,* 347 U.S. 409, 74 S. Ct. 608 (1954), comes from the statements of the dissent. *See id.* at 437, 74 S. Ct. at 623 (Black, J., dissenting).  By contrast, the plurality — whose remarks on this issue are not disputed by the lone concurring justice — sings the praises of the Limitation Act with respect to its underlying policies. *See id.* at 416-17, 74 S. Ct. at 612.  As stated by the Court:  "[I]f [the Limitation Act] is administered with a tight and grudging hand, construing every clause most unfavorably against the ship-owner, and allowing as little as possible to operate in his favor, the law will hardly be worth the trouble of its enactment." *Id.* at 422, S. Ct. at 615 (quoting *Providence & N.Y. S.S. Co. v. Hill Mfg. Co.,* 109 U.S. 578, 588-89, 3 S. Ct. 379, 385-86 (1883)).  Second, in *Hercules Carriers, Inc. v. Claimant State of Florida, Department of Transportation,* 768 F.2d 1558 (11th Cir. 1985),

that Congress has recently amended the Limitation Act, *see* Coast Guard

Authorization Act of 1996, Pub. L. No. 104-324, § 1129(a), 110 Stat. 3901

(codified as amended at 46 U.S.C. § 183(g)), in support of the position    that the

Limitation Act is vibrant and should not be implicitly repealed.

VI.

Upon reaching the conclusion that the Limitation Act and the PSRPA are

irreconcilably in conflict, the second step of the analysis is to conclude the

Limitation Act is implicitly repealed to the extent it interacts with the PSRPA.  As

with the question of irreconcilable conflict, *see supra* Part V, I reach the same

answer as the majority, but on a narrower basis.  I would repeal the Limitation Act

rather than the PSRPA for the sole reason that the PSRPA was enacted earlier in

time than the Limitation Act.  *See, e.g., S. Natural Gas Co. v. Land, Cullman

County,* 197 F.3d 1368, 1373 (11th Cir. 1999).  I would not, however, invoke the

majority's determination that this implicit repeal should also be based on the fact

that the PSRPA is a more specific statute than the Limitation Act.  *See* Opinion at

23.  Given that the PSRPA is the more recent statute, the specific versus general

basis is not necessary to reach the outcome that the PSRPA governs.  Furthermore,

---

this Court concluded that courts are obligated to apply the Limitation Act as it is written, despite
apparent judicial reservations about the Act.  *See id.* at 1565.

I conclude the Limitation Act and the PSRPA are both general statutes.[16]

## VII.

My anguish in reaching the conclusion that the Limitation Act should be implicitly repealed is due in large part to the principles of judicial restraint and separation of powers which underlie the particularly high standard required for an implicit repeal. Despite concerted attempts to reconcile the PSRPA and the Limitation Act, however, I found myself unable to do so. The conceptions of liability embedded in these two statutes are simply too far apart and too integral to allow for reconciliation. Therefore, I am satisfied with the outcome of this case. I

---

[16] I draw this conclusion because the two statutes cover broad sets of circumstances, which are mutually exclusive to a considerable extent and which intersect narrowly. That is, the Limitation Act covers the vessel-induced destruction of the sweeping range of property outside the realm of park system resources — including all private property — while the PSRPA does not extend to this property. Similarly, the PSRPA covers injury to the vast expanse of terrestrial park system resources, while the Limitation Act does not. The intersection of the two statutes is the narrow circumstance where a vessel injures marine park system resources.

This confluence of two general statutes is exemplified in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S. Ct. 1246 (1963). In *Silver,* the Supreme Court confronted the interplay between the Securities Exchange Act of 1934, which allows for self-regulation by securities exchanges, *see* 15 U.S.C. § 78f, including rules restricting interaction between exchange members and non-members, and the Sherman Anti-Trust Act, *see* 15 U.S.C. § 1, which proscribes collective action by exchange members to the detriment of non-members. *See generally Silver,* 373 U.S. at 347, 352-53, 83 S. Ct. at 1252, 1254-55. The Securities Exchange Act broadly regulates exchanges regardless of anti-trust implications, while the Sherman Act prohibits anti-trust activity generally, including circumstances not involving securities exchanges. The two statutes intersect in the narrow circumstances where securities exchanges are involved in potential restraints of trade. *See id.* at 349, 83 S. Ct. at 1252-53. *Silver* thus provides a model for this case. While I conclude the Limitation Act and the PSRPA are both general statutes, my primary reason for not broaching the specific versus general basis is that it is not necessary in this case.

wish to stress, however, that this outcome is atypical and should arise only after an earnest attempt at statutory reconciliation.

VIII.

For all the reasons described above, I concur.

TIDWELL, District Judge, specially concurring:

I concur with Judge Barkett's Opinion in all respects, except I agree with Judge Black's conclusion in her Special Concurrence that we should not consider the fact that courts have taken a restrictive view of the Limitation Act.